IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JANE DOE,

               Plaintiff,

v.

JAMES T. DEWEES, *et al.*

               Defendants

Civil Action No. TDC-18-2014

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff Jane Doe, pro se, opposes Defendants' Motion to Dismiss, filed  June 26,

2019, for the reasons set forth below.

## TABLE OF CONTENTS

Page

Table of Contents................................................................................................ 2

Introduction....................................................................................................... 3

Standard of Review............................................................................................. 3

Argument ........................................................................................................... 4

    Jane Doe is the real party in interest ................................................... 4

    No claims are time-barred. ................................................................. 6

    Doe has not engaged in "impermissible" group pleading .................. 13

    Deprivations by CCDC personnel constituted punishment or coercion ............. 13

    Doe has stated a claim for relief for Counts 13-16 ........................... 21

    Clerks are not immune from suit ...................................................... 22

    Prosecutors are not immune from suit .............................................. 27

    Judges are not immune from suit....................................................... 28

    Plaintiff has stated claims for relief against Sheriff and Warden ....... 37

    Governmental defendants fail to establish qualified immunity .......... 38

    County actors do not enjoy immunity from suit under Maryland law ............... 39

    Colorado Abstention is unwarranted ................................................. 42

Conclusion ....................................................................................................... 43

Certificate of Service ....................................................................................... 43

## INTRODUCTION

Defendants' own characterization of this case as based on Doe's "refus[al] to properly identify herself to sheriff's deputies, district court commissioners, judges, and correctional officers" supports Doe's version of events — that all such persons encountered continually sought to compel or persuade Doe through various unconstitutional means to "identify herself." These persons worked together or encouraged each other in their efforts to persuade Doe  to testify against herself in a criminal matter, and in the course of these efforts, committed numerous constitutional torts against her in an effort to either punish her for her "refusals" or coerce her to "identify herself."

## STANDARD OF REVIEW

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks and brackets omitted). To survive such a motion, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and have "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "In assessing the complaint's plausibility, we accept as true all the factual allegations contained therein." *De'Lonta v. Johnson,* 708 F.3d 520, 524 (4th Cir. 2013). Factual allegations contained in the complaint are construed in the light most favorable to the

plaintiff. *Id., at* 523, citing *Flood v. New Hanover County*, 125 F.3d 249, 251 (4th Cir.1997).

*Pro se* complaints are to be liberally construed. *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 72 (4th Cir. 2016). '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976), quoting *Haines v. Kerner* 404 U.S. 519, 520-521 (1972) (internal quotation marks omitted). Where a complaint is inadequate, leave to amend the complaint is common. *See, e.g., Butt v. United Brotherhood of Carpenters & Joiners of America,* No. 09–4285, 2010 WL 2080034 (E.D. Pa. May 19, 2010).

### ARGUMENT

JANE DOE IS THE REAL PARTY IN INTEREST

An action "must be prosecuted in the name of the real party in interest." F.R. Civ. P. 17(a)(1). Defendants' accept that Doe is the real party in interest, but object to her *name*, seemingly assuming Jane Doe is a pseudonym adopted by Plaintiff for the purposes of this lawsuit. (*See, e.g.,* Mot. p. 7, quoting *Jacobsen* factors for proceeding pseudonymously.)

A complaint may not be dismissed on grounds that a factual allegation contained therein is false, since all factual allegations are accepted as true. *See De'Lonta, supra*, at 524. Accordingly, Doe's assertion in the complaint that her name is Jane Doe and that

she is the real party in interest (Doc. 18, ¶ 10) must be accepted as true, and the complaint may not be dismissed on the ground that Jane Doe is not her name.

Ordinarily, "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3).

Assuming in *arguendo* that Defendants have used a Rule 12(b)(6) motion to object under Rule 17(a)(3), Plaintiff has already ratified to this Court that she *is* the real party in interest, and that her name is Jane Doe. *See* Declaration of Jane Doe, Exhibit A, Doc. 5, *see* also Exhibits B through L. Further, in the interest of brevity, Plaintiff adopts and incorporates by reference thereto Plaintiff's entire Response to Order to Show Cause (Doc. 5), and all the Exhibits attached thereto. Doe provided affidavits from third parties verifying that her name is Jane Doe, as well as news clippings, and this Court has already determined that Jane Doe is Plaintiff's legal name. (Doc. 9, p.1).

Finally, contrary to Defendant's assertions, Doe is under no obligation or duty to "legally change[] her name … with any state government." Under the common law of Maryland, Doe may change her name at any time without application to the courts or any agency. No statute passed by Maryland abrogates this common-law right.[1] See Doc. 5. Defendants likewise cannot show that Doe is required to provide "government-issued identification confirming her true identity" in order to file suit. No statutory, rule, or decisional authority supports Defendants' proposition that only persons with government-

---

[1] Md. Rule 15-901 allows for an action to convey the government's "official sanction" on a chosen name, but this imposes no requirement on anyone to change their name in this manner.

issued ID enjoy access to the federal courts for redress of grievances (and Defendants fail to cite any such authority). Finally, Defendants have only known Plaintiff as Jane Doe throughout all arrest, detention, and criminal proceedings complained of, and have failed to show how they are prejudiced in any way by the use of her legal name.

No CLAIMS ARE TIME-BARRED.

Defendants move to dismiss on grounds that certain counts are time-barred. Ordinarily, a defense based on the statute of limitations must be raised by defendants through an affirmative defense, *see* Fed.R.Civ.P. 8(c), and the burden of establishing the affirmative defense rests on defendants. *See Newell v. Richards,* 323 Md. 717, 594 A.2d 1152, 1156 (1991); *accord Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.,* 427 F.2d 862, 870 (4th Cir.1970). Thus, a motion to dismiss pursuant to Rule 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense that the plaintiff's claim is time-barred — except in relatively rare circumstances where facts sufficient to rule on such defense are alleged in the complaint. This principle only applies "if all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint.'* *Richmond, Fredericksburg & Potomac R.R. v. Forst,* 4 F.3d 244, 250 (4th Cir.1993) (emphasis added); *accord Desser v. Woods,* 266 Md. 696, 296 A.2d 586, 591 (1972)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007).

Counts 1-8, 10 and 18-20 *possibly* contain "all facts necessary" to determine whether they are time-barred. Plaintiff filed her complaint on July 2, 2018, and Defendants assert generally against Counts 1-8, 10, and 18-20 that where "material events" giving rise to Doe's claims for relief occurred prior to July 2, 2015, Doe is barred from asserting those claims due to the application of Maryland's three-year statute of limitations governing general personal injury actions. (p. 9).

Counts 12 ("partially time-barred"), 15, and 34, however, do *not* contain "all facts necessary" to determine whether they are time-barred. There, Defendants argue that additional parties and the claims asserted against them pursuant to Doe's amended complaint filed April 25, 2019 are barred by the three-year statute of limitations. A motion to dismiss cannot reach the merits as to whether claims against those particular defendants are time-barred.

Nevertheless, all Defendants' arguments that claims are time-barred are largely unavailing, because they ignore accrual periods for claims under § 1983, the federal rules for computing time and amending complaints, and the relation-back doctrine.

Doe's Complaint was effectively filed June 30, 2018

Section 1983 of Title 42 does not specify a method of computing time, and thus Fed. R. Civ. P. 6 provides the method of computing time for complaints filed under that statute. When the last day for filing falls on a Saturday or Sunday and the clerk's office is inaccessible, then the time for filing is extended to the first accessible day. Rule 6(a)(3)(A). The effective filing date of Doe's complaint was June 30, 2018, a Saturday, since Doe filed her complaint the next accessible day: July 2, 2018, a Monday.

Fourth Amendment claims reflecting false imprisonment, malicious prosecution, and illegal search and seizure accrued on June 30, 2018 or later

"A civil action at law shall be filed within three years from the date it *accrues.*" MD. CODE ANN., CTS. & JUD. PROC. § 5-101 (emphasis added). This law supplies the relevant three-year statute of limitations under *Wilson v. Garcia*, 471 U.S. 251, 105 S.Ct. 1938 (1985) *from any claims' accrual.*

The statute of limitations upon a § 1983 claim seeking damages for seizure in the form of a false arrest (a species of false imprisonment), in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at least at the time a claimant becomes detained *pursuant to legal process.  Wallace v. Kato et al,* 549 U.S. 384, 397, 127 S. Ct. 1091, 1100 (2007).[2]  False imprisonment "consists of detention without legal process, a false imprisonment ends once the victim become held *pursuant to such process,* he is bound over by a magistrate ..." (emphasis in original).

Doe was not bound over to trial, and bail was not set, until the hearing before Defendant Judge Reece on June 30, 2015.[3]  Under *Wallace,* the false imprisonment imposed by the Sheriff's Deputies ended only when Doe appeared before Judge Reece, the examining magistrate who bound her over for trial. *Id.,* at 389, 391. Accordingly, the unreasonable seizure of Doe under the Fourth Amendment (false arrest/imprisonment) initiated by Sheriff's Deputies Craft, Kriete, and Metzler did not end until at least June 30, 2015. Under the *Wallace* claim accrual rule, Doe thus timely filed her claims against them on the final day of the three-year statute of limitations.

Nevertheless, the time period for accrual of a claim asserting a violation of the Fourth Amendment in Wallace is not controlling, since such time period was further extended by the Supreme Court's holding in *Manuel v. City of Joliet, Ill.,* 136 S. Ct. 890 (2017).  The Supreme Court stated succinctly that "pretrial detention can violate the Fourth Amendment *not only* when it precedes, but also when it follows, the start of legal

---

[2] The *Wallace* court cited the following: "Limitations begin to run against an action for false imprisonment when the alleged false imprisonment ends." 2 H. Wood, *Limitation of Actions* § 187d(4), p. 878 (4th rev. ed. 1916). *See also* 4 Restatement (Second) of Torts § 899, Comment *c* (1977); A. Underhill, *Principles of Law of Torts* 202 (1881).

[3] Commissioner Miner refused to set bail or bind Doe over for trial, but further falsely imprisoned Doe for refusing to provide testimony against herself satisfactory to Miner.

process in a criminal case." *Id.*, at 918.   Manuel also recognized that where the unreasonable seizure of a claimant was based on false statements made by law enforcement officers in initiating criminal proceedings, a violation of the Fourth Amendment occurred, cognizable under § 1983, and that pretrial detention constituted a continuing seizure within the meaning of the Fourth Amendment.   Upon remand, the Seventh Circuit determined that *any claim* concerning continued detention without probable cause,[4] as was the case in *Manuel*, accrued when plaintiff was finally out of custody and could sue. *Manuel v. City of Joliet, Ill.*, 903 F.3d 667, 670 (7th Cir. 2018). Judge Easterbrook noted that "the line that the Justices drew in *Wallace* — in which a claim accrues no later than the moment a person is bound over by a magistrate or arraigned on charges, ... and all Fourth Amendment claims are to be treated alike — did not survive *Manuel.*" *Id.,* at 669.

Further, when a wrong is ongoing rather than discrete, the period of limitations does not commence until the wrong ends. *See National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 115-21, 122 S.Ct. 2061 (2002).

Doe articulated claims that she was seized illegally by means of false arrest/imprisonment, malicious prosecution, the failure of the court commissioner to perform her judicial duty, and the setting of excessive bail and continued detention of Doe in order to compel testimony, and these illegal seizure(s) continued until she was released from custody on September 1, 2015.   Further, through an initial illegal search,

---

[4] *See Brendlin v. California,* 551 U.S. 249, 254, 127 S.Ct. 2400 (2007) ("A person is seized" whenever officials "restrain[ ] his freedom of movement" such that he is "not free to leave"), and *Bailey v. United States,* 568 U.S. 186, 192, 133 S.Ct. 1031 (2013) ( "[T]he general rule [is] that Fourth Amendment seizures are 'reasonable' only if based on probable cause to believe that the individual has committed a crime").

the "poisonous fruit" of flash drives in her possession were illegally seized and the information on those drives was copied and remained in the possession of the Sheriff's office to be the subject of further illegal searches to the present time, or at least, through the time Doe was detained in violation of the Fourth Amendment. If, as the Supreme Court or Easterbrook stated, the wrong continues until it comes to an end, then Doe timely filed for all Fourth Amendment claims for continued seizure without probable cause of property which was in her possession, property which continues to be seized.

Claims accrued at the time deprivations and seizure *ended*

Counts 12, 14, and 15 contain claims of constitutional violations which were cumulative and continuing in nature.  Some of these periods of deprivation began as early as June 27, 2015, but of relevance here is that no period of deprivation, nor the seizure without probable cause of Doe in "suicide watch," ended before July 1, 2015 — and most ended July 2 or thereafter.  Since Doe effectively filed her complaint Accordingly, the doctrine of continuing violation

A period of continuous deprivation of a basic human need or right guaranteed by the constitution comprises a single, indivisible injury, not a series of discrete events. "Where a continuing tort causes a single, indivisible injury, the cause of action accrues at, and limitations begin to run from, the time when the nature and extent of the damage are ascertainable, which may be at the inception of the tort or not until the last day of the tortious conduct." 54 C.J.S. Limitation of Actions § 204 (2005).

In the case of a "continuing violation," the statute of limitations does not begin to run until the wrongdoing ceases. *Patrick v. Sharon Steel Corp.*, 549 F.Supp. 1259, 1264 (N.D.W. Va.1982) ("Where a tort involves a continuing or repeated injury, the cause of

action accrues at, and limitations begin to run from the date of the last injury, or when the tortious overt acts cease."). The "continuing violation" doctrine applies to prisoner complaints asserting Eighth Amendment infringements, as Plaintiff has here. *See DePaola v. Clarke,* 884 F.3d 481, 487 (4th Cir. 2018), citing *Heard v. Sheahan,* 253 F.3d 316, 318 (7th Cir. 2001). Doe submits that continuing violations of her First and Sixth Amendment rights can be treated no differently than the Eighth Amendment ones.

<u>Relation-back doctrine established Doe's claims against added parties</u>

Fed. R. Civ. P. 15(c)(1)(C) provides that an amendment relates back to the date of the original pleading when:

> the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Rule 15(c)(1(B) provides that in order to relate back to the date of the original pleading, that amendment must assert a claim that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading. Such is the case here, and Defendants have not asserted any defense to the contrary. The naming of additional parties is a "change" in parties as contemplated by the rule. *Goodman v. Praxair, Inc.,* 494 F.3d 458, 468 (4th Cir. 2007) (Citing, *inter alia,* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1498 (2d ed. 1990)).

Pursuant to this Court's Order of February 11, 2019, Doe had until May 11, 2019 to serve all Defendants named in the original complaint. Service of the original as well as

the amended complaint *was* accomplished against all named Defendants, except two, by May 11, 2019.  Therefore, all Defendants but two received notice of the action within the period provided by Rule 4(m); in fact, they were served within the same time frame that the originally named Defendants were served, thus suffered no prejudice in defending on the merits.  Further, the two remaining Defendants were served by May 14, 2019: Defendants Rochelle Herman and John Glorioso.  Herman was identified in the original complaint as "Unidentified Contractor, CONMED," and Gloriso was identified in the original complaint as an "Unidentified District Court Clerk."  Thus, both parties "knew or should have known that the action would have been brought against" them; they were only misnamed in the original complaint because Plaintiff was mistaken concerning their actual identity, a mistake rectified in filing of her amended complaint. They too "received such notice of the action that [they were not] prejudiced in defending on the merits; the proof of this is that they have joined all other Defendants — originally named and added — in the instant motion to dismiss.[5]

Counts 1 through 8 are not time-barred, since all events occurring prior to June 30, 2015 caused constitutional wrongs to Doe which continued past that date, including claims related to battery, which resulted in lasting emotional distress.  Further, in Counts 1 and 2, the illegal search of the vehicle was foundational to the illegal seizure of the flash drives, which were copied and continued to be in the possession of the Sheriff's office or the detention center — thus, even the wrongful search resulted in a continuing wrong.

Count 10 against Defendant Miner is likewise not time-barred, because when she refused to take the judicial actions she is mandated to take and confined Doe for

"recalcitrance," *i.e.,* took no cognizable judicial action within her jurisdiction, she continued or began a new seizure of Doe in violation of the Fourth Amendment, which did not come to an end until September 1, 2015, when Doe was released from custody.

DOE HAS NOT ENGAGED IN "IMPERMISSIBLE" GROUP PLEADING.

Defendants argue that "group pleading" is insufficient. Yet, Plaintiff has identified, to the best of the information available to her at present — that is, without the aid of discovery — the specific Defendants responsible for the constitutional torts perpetrated against her. The very nature of the circumstances which led to Plaintiff's complaint, and her continued detention,  prevented her from being able to more accurately identify every single actor actually responsible at any given day or time for the continuation of the torts against her, but she has identified the specific officers with whom she interacted, and they are on notice that there are claims against them.  A period of discovery for the purpose of nailing down which officer worked on which specific day during which shift would be in the interest of justice.

DEPRIVATIONS BY CCDC PERSONNEL CONSTITUTED PUNISHMENT OR COERCION

Doe's claims (which must be taken to be true) are that she was, for an initial extended period of time, deprived of food, sleep, hygiene, dignity, appropriate exercise, a Bible, religious counsel, visitation and legal access, along with forcibly attiring her in a suicide suit; raises a reasonable and plausible inference that Defendants caused the deprivations complained of to punish Doe for failing to "comply" and for exercising her right to remain silent — just as Doe has set forth in her claim for relief.  No law or authority allows or approves punishing detainees for failing to answer questions or sign documents.

Defendants state: "The Due Process Clause of the Fourteenth Amendment provides that pretrial detainees may not be subjected to 'conditions [that] amount to punishment.' *Bell v. Wolfish*, 441 U.S. 510, 535 (1979)," and that conditions amount to punishment when they are "not reasonably related to a legitimate nonpunitive governmental objective," citing *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988). *See also United States v. Hall*, 551 F.3d 257, 273 (4th Cir. 2009). Defendants have failed to show that the deprivations experienced by Doe at the hands of the correctional officers and the Warden served or were "reasonably related to" any legitimate nonpunitive governmental objective. It is axiomatic that a legitimate governmental objective does *not* include attempts to compel evidence or testimony from detainees; and this is the gravamen of Doe's claim. Most of the authorities cited by Defendants concern the treatment of convicted prisoners, not pretrial detainees awaiting trial, and on that ground, are unavailing.

Each deprivation asserted cannot be judged in isolation from the rest; Doe has set forth a claim that *all of these deprivations* in combination were intentionally caused to inflict punishment for the exercise of her right, primarily, the right not to give Defendants a name according to their approval or satisfaction. These deprivations were intentional, concurrent, and cumulative, and further imposed with a design to inflict emotional distress, in order that she would be compelled through the combined weight of such deprivations to succumb and give evidence against herself in a criminal matter.

Establishing a violation of the Eighth Amendment for a *prisoner* requires a two-part showing. First, an inmate must objectively show that he was deprived of something "sufficiently serious." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S. Ct. 1970 (1994). A

deprivation is sufficiently serious and violates the Constitution when the prison official's act or omission, either alone or in combination, results in the denial of "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S. Ct. 2392 (1981). "[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer, at* 832. While a prisoner must make a subjective showing that the deprivation occurred with deliberate indifference to the inmate's health or safety, *see Wilson v. Seiter,* 501 U.S. 294, 302-03, 111 S. Ct. 2321 (1991), a *pretrial detainee* whose claims are cognizable under the Fourteenth rather than the Eighth Amendment  must only show objectively that she was deprived. *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015). *Kingsley* was an excessive force case, but the objective standard of deliberate indifference should be applied to all cases by pretrial detainees. *See e.g., Darnell v. Pineiro,* 849 F.3d 17 (2d Cir. 2017), *Castro v. County of Los Angeles,* 833 F.3d 1060, 1070 (9th Cir. 2016), cert. denied, 137 S. Ct. 831 (2017).

**1. Deprivation and Withholding of Food.** Despite Defendants' knowledge on June 27, 2015 that food containing gluten presents an immediate danger to Doe's health, Defendants deprived her of appropriate food through July 1, 2015.  Since her complaint was effectively filed June 30, 2018, and the continuing violation doctrine applies, see *supra,* the accrual of her claim of deprivation of food was July 1, 2015, and she is not time-barred from making this claim.

Depriving a person of food for five days would impose a constitutionally significant hardship, *See Reed v. McBride,* 178 F.3d 849, 853-54 (7th Cir.1999); *Foster v. Runnels,* 554 F.3d 807, 814-15 and n. 5 (9th Cir.2009); *Simmons v. Cook,* 154 F.3d 805, 808 (8th Cir.1998) (prisoners awarded $2000 each in compensation for being denied four

consecutive meals). *See* also *Keenan v. Hall,* 83 F.3d 1083, 1091 (9th Cir.1996) ("Adequate food is a basic human need protected by the Eighth Amendment.").[2]

**2.  Deprivation and Withholding of Sleep.**  For the same reasons given in ¶ 1, *supra,* Plaintiff is not time-barred from asserting her claim that she was deprived of sleep for *nine* days.  Doe was not simply deprived sleep due to prison conditions, but to an intentional manipulation of her environment over the period of deprivation (booking cell where light was never turned off and noise from booking area continued throughout night, *see* ¶¶ 73-76). *Intentionally causing* deprivation of sleep is not reasonably related to a legitimate governmental objective; for that reason, Doe's allegations *do* meet the *Bell* standard, particularly in light of her claim that this was but one of cumulative deprivations meant to punish and/or coerce her into giving testimony against herself.

Thus, Doe does not complain of disturbance of sleep due to general prison conditions, as alleged in *Spivey v. Doria* (unpublished case cited by Defendants, Mot. 19), nor of occasional intermittent high noise levels generally imposed such as complained of in *Lunsford v. Bennett,* 17 F.3d 1574, 1580 (7th Cr. 1994) (also cited by Defendants), but for conditions specifically imposed upon her which ended when she was transferred out of the booking cell.

**3.  Deprivation of Hygiene and Dignity**  For the same reasons given in ¶ 1, *supra,* Plaintiff is not time-barred from asserting her claim for deprivation of basic hygiene and dignity for *eleven* days (noting just one shower during that period, and no adequate means to clean herself).

Defendants deprived Doe of any materials with which to clean or groom herself except a tiny comb which could not comb Doe's hair, and a hotel-sized bar of soap, but

no washcloths or towels with which to effectively clean or dry herself, and no towels or other materials with which to cover her genitals or breasts exposed to guards and surveillance cameras (¶¶ 88-90). Accordingly, materials with which to clean herself were not provided. *Shakka v. Smith,* 71 F. 3d 162.168 (4th Cir. 1995), cited by Defendants, stands for the proposition that both water and *materials* for cleaning oneself are required to provide the minimal necessities. Similarly, Doe had *nothing* to cover herself with when using the toilet. *Riddick v. Sutton*, 794 F. Supp. 169 (E.D.N.C. 1992) extinguished a claim for relief where towels or papers provided for cover were sufficient to ensure prisoner's privacy; Doe has alleged she had no such cover. Accordingly, Doe has stated a claim for relief.

**4. Deprivation of Recreation, Fresh Air, or Exercise.** For the same reasons given in ¶ 1, *supra,* Plaintiff is not time-barred from asserting her claim for deprivation of out-of-cell recreation or exercise, or fresh air, for *six* days. Plaintiff can only find decisions related to exercise and fresh air regarding prisoners.

**5. Deprivation of Religious Exercise and Pastoral Visitation.** For the same reasons given in ¶ 1, *supra,* Plaintiff is not time-barred from asserting her claim that she was deprived of access to a Bible for *nine* days.

Defendants mischaracterize *Lovelace v. Lee,* 472 F.3d 174, 187 (4th Cir. 2006) interpreting RLUIPA, 42 U.S.C. §§ 2000cc *et seq.,* which forbids governments from imposing substantial burdens on religious exercise, even by a rule of general applicability. Under RLUIPA, the government must demonstrate that any rule imposed by the institution denying freedom of religious exercise is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that ... interest."

Religious Land Use and Institutionalized Persons Act of 2000, § 3(a), 42 U.S.C. § 2000cc-1(a).[6] In *Lovelace,* the Court found that Lovelace, a Muslim, *was* substantially burdened in his religious exercise by being denied the practice of one of the pillars of his religion without any governmental justification therefore. Thus, the prison violated his beliefs. In *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 761 (7th Cir. 2003), the Court explained that a substantial burden upon a religious exercise is one that "necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise ... effectively impracticable." Here, Plaintiff alleged that it is a practice of her religion, Christianity, to read God's Word, the Bible. Defendants' direct and continued denials of a Bible, despite repeated requests, were directly responsible for rendering Doe's religious exercise completely *impossible*, not just "effectively impracticable." Nevertheless, Defendants have attempted to apply a standard which pertains to institutional regulations governing religious exercise, and Doe has made no claim with respect to a "substantial burden" upon her religious belief caused by a CCDC rule or policy.  Instead, Defendants intentionally, repeatedly, and *unreasonably* denied *her* a Bible, even although Bibles are available for all inmates and detainees at CCDC. (¶¶ 112-114) Further, Defendants intentionally, repeatedly, and *unreasonably* denied her visitation from her pastor. (¶ 118).   Defendants have failed to show Doe has no claim, and have failed to show any legitimate penological or other governmental interest in denying her a Bible and visitation from a spiritual counselor, her pastor.

---

[6] Likewise, *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987), cited by Defendants, involved the standard of review for prison regulations claimed to inhibit the exercise of constitutional rights, and is inapplicable here. This case was resolved prior to RLUIPA, and thus employed a standard of reasonableness to prison regulations inhibiting the free exercise of religion; Congress passed RLUIPA for the express purpose of establishing stricter scrutiny with respect to such regulations.

**6. Deprivation of Visitation.** Defendants assert Doe has not stated a claim because an *inmate* does not have a constitutional right to visitation, citing *Williams v. Ozmint,* 716 F.3d 801, n8 (4th Cir. 2013). Prisoner Williams was denied his claim because his suspension of visitation privileges followed a prison officer's observation that Williams received contraband. *Id.,* at n9.

Further, while *White v. Keller,* 435 F. Supp. 110, 115 (D. Md. 1977) stated there was no "affirmative constitutional right"[7] to visitation for a *prisoner*, that court also noted that cases "holding that there *is* a constitutional right to *some* visitation [for prisoners] are the more reasoned cases. Those holding there is no such right tend to just do so. *Compare, e. g., Hamilton v. Saxbe,* 428 F.Supp. 1101 (N.D.Ga.1976) and *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976) *with McCray v. Sullivan, supra, and Henry v. Delaware, supra.* However, what few courts of appeals decisions there are fall into the latter category." Id., at 115. (emphasis in original). Thus, even for prisoners, a constitutional right to visitation has been recognized by courts. *White* also recognized, at 116:

> It is clear that free members of society have rights of physical association, whether grounded in the first amendment —a source about which this court has serious analytical reservations — or in the concept of liberty — a more satisfying source analytically. It is equally clear that whatever the source and whatever the extent of the right to associate physically in free society, that right may be curtailed upon conviction for violation of the criminal laws. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 97 S.Ct. 2532-2538-40 (1977). To the extent that the right to physical association is grounded in "liberty," it is obvious from the language of the fifth and fourteenth amendments that the state may wholly deprive one of it upon a criminal conviction. It is less obvious, but equally sensible, that the right is lost even if its source is the first amendment."[8]

---

[7] But *see Id.,* at n4: "The emphasis on an 'affirmative' right is to distinguish the possible existence of a negative right which might be implicated under the eighth amendment if all visitation was denied permanently."

[8] See extensive analysis in *White* concerning the source of the right to freely associate with others at n7

Thus, it is *conviction* which curtails the right to visit, not pre-trial detention.  The right to associate with others (i.e., "visit" with others) exists already as an independent, fundamental constitutional right under the First Amendment's guarantee of the freedom to assemble (or under other constitutional liberty guarantees), and it is part of the constitutional protection against punishment guaranteed to pretrial detainees such as Doe.

Obviously, *imprisonment* is an imposed separation from family and friends, but it does not follow that a person who is detained and not convicted may be arbitrarily deprived of contact with family and friends within the visitation framework established by a detention center.

Certainly, legitimate penological goals may curtail the times and circumstances of visits, but Doe's claim is that while even convicted prisoners at CCDC enjoyed such visitation *privileges*, Doe was arbitrarily and intentionally denied similar and equal visitation *rights*.  Defendants' citations, without more, do not admit of dismissal at this early stage of the proceeding, particularly where the denial of visitation was part of a *pattern* of punishing Doe for exercising her right not to testify against herself in the first instance. Defendants have not established that Doe had no right to visitation and she has stated a claim for relief, based on her status as a pretrial detainee.

**7.  Deprivation of Access to Lawyer, the Law and Writing Materials.**  For the same reasons given in ¶ 1, *supra,* Plaintiff is not time-barred from asserting her claim that she was deprived of writing materials for *nine* days (with the exception of 30 minutes).

---

including: " ... prison visitation raises questions of the right to physical association. The right sought is to see and visit in person with another individual. There may well be a first amendment right to physical association, *see Griswold v. Connecticut,* 381 U.S. 479, 483, 85 S.Ct. 1678 (1965) (right of association includes right to attend a meeting); *see also De Jonge v. Oregon,* 299 U.S. 353, 57 S.Ct. 255 (1937). ...an individual may be entitled to have his right to associate ideologically restricted only upon a showing by the state of a substantial interest and then only by the least restrictive means. *See Procunier v. Martinez,* 416 U.S. 396, 413, 94 S.Ct. 1800 (1974)." (some internal citations omitted)

Doe was frustrated and impeded in her legal claims and her legal defense as a result of denials of access to legal research and to writing materials, specifically, she was unable to "research or prepare any *habeas corpus* writ, any motion opposing Plaintiff's motion to compel fingerprints or any motion to reconsider Ellinghaus-Jones' order to compel fingerprints, any motions or correspondence for appropriate discovery, and was denied the ability to prepare for her defense of the ten charges maliciously prosecuted against her." (¶¶ 152). Accordingly, she has stated a claim cognizable under the terms elucidated in *Lewis v. Casey*, 518 U.S. 343, 353 (1996).

Defendants point to Doe's assertion that she was frustrated in her attempts to visit her (eventual) lawyer on or about July 15, 2015 (¶ 149, p. 67), and conclude that Doe "concedes that she was represented by counsel." (Mot. p. 24). It is *not* a fact that Doe was represented by counsel on that date, nor did any lawyer ever put in an appearance with the court. The first and only time she could be said in any way to have been "represented" was on the filing of one motion by an attorney on July 24, 2015. (¶ 41, p.162). This was after she had been detained and deprived of legal materials for about a month, and only because she was unable to invoke legal process by herself, having been denied legal access to do so.

Doe has an unqualified right to represent herself, and to simultaneously consult with lawyers, without being "represented" by the same. Defendants have not demonstrated that Doe failed to state a claim for denial of access to the courts.

DOE HAS STATED A CLAIM FOR RELIEF FOR COUNTS 13-16

Read in the light most favorable to Doe, the gravamen of Doe's claims against Defendants Blizzard, Medevich, Cerny, Schaum and Herman is that these Defendants

forced her into a suicide suit on June 29, 2015 for improper reasons unrelated to any medical or penological necessity. Doe was not suicidal, and all the actions of the Defendants were undertaken to violate the security of Doe's person by imprisoning her in in a special confinement status known as "full suicide watch," dressed in a "turtle" suit and deprived of a Bible and writing materials in order to obtain and will so that she would testify or give evidence against herself, or, in the alternative, in order to punish Doe for exercising her right not to testify or give evidence against herself.

As they do throughout their motion to dismiss, Defendants continually label the facts in Doe's complaint as "conspiracy theory" and "implausible" so as to invoke *Bell* and *Twombly* standards. These are repeated "buzzwords," with the hope that this Court will not actually carefully read the allegations and see that they evince a constant pattern of force, threats and deprivations to obtain testimony from Doe. With respect to Count 16 and Britnie Boschert, Defendants simply state that they are implausible. Yet see ¶ 172, p. 96, that all COs and medical staff relied on inmates and detainees' self-reporting of food an drug allergies, and the direct threat from Boschert that without a note, she would ensure Doe was given food that was poisonous to her, and it seems plausible that such a threat was not made merely out of vindictiveness, but with a purpose — to see if Doe would contact a doctor and obtain a note which would perhaps identify her for the ongoing investigation into her "identity."

<u>Clerks and Administrative Clerk are not immune from suit</u>

Doe was falsely imprisoned (*i.e.,* seized without probable cause or due process, and thereby deprived of liberty) for over four days after all charges were dismissed by *Nolle Prosequi* on August 28, 2015. The proximate cause of her false imprisonment of five days, from August 28 through September 1, 2015, was an omission of one or more of

the court clerks to properly record and issue the release writ to the detention center as immediately as practicable following the release order by the judge.  This failure is also directly attributable to the failure of the Administrative District Court Clerk to supervise and train.

Defendants assert that they must be dismissed because they are immune from suit when they are "performing tasks that are integral to the judicial process," citing *D'Aoust v. Diamond,* 424 Md. 549, 599, 36 A.3d 941 (2011), *Gill v. Ripley,* 352 Md. 754, 724 A.2d 88, 96 (1999).  *Gill* concerned prosecutors, not clerks, but stated that "[t]here have ... been a number of cases dealing with the extension of judicial immunity ... to court clerks who act under the direction of a judge or who implement the judicial orders of one kind or another." *Id.,* at 96.[9]  A clerk who *implements* a judicial order is not committing a "judicial" act, but a ministerial one.  Because the judge made the order, naturally the clerk's obedience to it conveys ("extends") any immunity deemed possessed by the judge to himself. But as is the case here, the clerk did *not* implement the judge's order of release upon dismissal of all charges on August 28, 2015.  Judicial immunity cannot extend to the Clerks' omissions here, because the omissions *themselves* were not ordered by a judge, and the Clerks had no independent judicial or quasi-judicial action to undertake.

The District Court clerks have duties strictly prescribed by law. MD. CODE, CTS. & JUD. PROC. ("CJP") § 2-201 provides, *inter alia,* that the clerk of a court shall "[h]ave custody of the books, records, and papers of his office," shall "[m]ake proper legible entries of all proceedings of the court and keep them in well-bound books or other

---

[9] Citing many federal circuit cases, but none from the Fourth Circuit.

permanent form;" shall "[i]ssue all writs which may legally be issued from the court," and shall "[p]erform any other duty required by law or rule."

When a *nolle prosequi* is entered on charges, a defendant need not be present in the courtroom. But where neither defendant nor defendant's attorney is present, as in this case, Md. Rule 4-427 *requires* "the clerk *shall send notice to the defendant, if the defendant's whereabouts are known*, and to the defendant's attorney of record."(emphasis added). Further, the Rule provides, at (b):

> When a nolle prosequi has been entered on a charge, *any conditions of pretrial release on that charge are terminated*, and any bail bond posted for the defendant on that charge shall be released. The *clerk shall take the action necessary to recall or revoke any* outstanding warrant or *detainer that could lead to* the arrest or *detention of the defendant* because of that charge. (emphases added)

The functions of the District Court clerks, then, including taking the "action necessary to recall or revoke any … outstanding detainer that could lead to the … detention of the defendant," are ministerial, mandatory, not discretionary, and not subject to judicial immunity. As the Court of Appeals pointed out in *D'Aoust v. Diamond, et al*, 424 Md. 549,  36 A.3d 941, 964 (2012): "Ministerial acts are those done by officers and employees who are required to *carry out the orders of others* or to administer the law with little choice as to when, where, how or under what circumstances their acts are to be done. Restatement (Second) of Torts § 895D cmt. h." *Id.,* at 964. Similarly, "[M]inisterial acts are those 'amounting only to an obedience to orders, or the performance of a duty in which the officer is left no choice of his own.' [W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 132, at 988–89 (5th ed. 1984)]." *Id.,* at 964. Here, the order of the Court to release Doe was *not* carried out by the clerks who are tasked with carrying

it out: this constitutes *an omission* of a required ministerial act, not a discretionary judicial act.

As explained by *McCray v. Maryland*, 456 F.2d 1, 4 (4th Cir. 1972): "Clerical duties are generally classified as ministerial, 2 Harper & James, *The Law of Torts*, 1644 (1956)." The position of court clerk has always been recognized historically as a ministerial function of a judicial system. See *Restatement of the Common Law*, Clerks of Court § 1,620 (1929).[10] "A state officer is generally not immune under common law for failure to perform a required ministerial act. 2 Harper & James, *supra* at 1645-46. For example, registrars of deeds have been held liable in common law tort actions for negligently failing to properly index a mortgage. Thus there is no basis for sheltering the clerk from liability under section 1983 for failure to perform a required ministerial act such as properly filing papers." McCray, at 8. Further, "[t]he cases relied on by the District Court which have held that a clerk has judicial immunity are inapposite. In *Brown v. Dunne* and *Rhodes v. Meyer* ... cited by the District Court, the defendant was held not liable because the actions complained of were taken in the discharge of his lawful duties as court clerk-*not in neglect or violation of those duties.*" Id., at 10.[11]

---

[10] From this majority recognition of the courts, Defendants cite an outlier New York case, *Rodriguez v. State,* 285 N.Y.S.2d 896, 902 (1967) which "finds the Clerk's *duty* of notification that probation had ended to be a quasi-judicial act related to the sentencing process. Thus it differs from the *duties* of the Clerk to keep and certify records, which *duties* have been classified as ministerial in nature."(emphasis added). Notably, no authority or reasoning supported this pronouncement that a *duty* of notification is quasi-judicial and this case was never cited by any other court. Indeed, if such notion is true, then it follows that every dutiful *mailing* of a court order or event to a government official constitutes a "quasi-judicial act," while every dutiful *filing or recording* of that same order or event is only "ministerial."

[11] Likewise, the cases relied upon by Defendants here are nearly all rejections of claims against clerks who were carrying out judicial orders.

Defendants assert Doe has stated no claim for relief because no Clerk "directly restrained" Doe, and there is a "direct restraint element" necessary for a false imprisonment claim. For a claim that Doe was seized and deprived of liberty in violation of the Fourth, Fifth, or Fourteenth Amendments, however, no "direct restraint element" exists, and Defendants have cited no authority for this proposition. It is a violation of § 1983 to "subject[], *or cause[] to be subjected*, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." (emphasis added). Defendants further state that Doe has not "plausibly alleged" this direct restraint element, and thus her allegations fail to state any constitutionally cognizable claim.

Doe's claim against the Clerks does not sound in negligence only (Mot. p. 41); she has alleged deliberate indifference or gross negligence, which will give rise to a claim. Further, the facts show Defendants were readily aware of Doe's release, had mailed notices to her address on August 28, 2015, had sent a trial cancellation notice to the detention center on August 28, 2015, printed and placed the release order in the court file on August 28, 2015 — and yet failed to send the order releasing Doe to the detention center along with the trial cancellation notice. (¶¶ 9-14, p. 171). A plausible inference — one that is superficially reasonable, but could, after discovery, turn out to be inaccurate — would be that Defendant Clerks *deliberately* omitted the order releasing Doe while they were processing all other notices.

Count 34 against the Clerks, and Count 35, the "derivative claim" against Defendant Smith for failing to train, supervise and discipline subordinate clerks — brought against her in her administrative and supervisory capacity — are therefore not

due to be dismissed. Plaintiff should be allowed to conduct discovery so as to establish the state of mind element.

PROSECUTORS ARE NOT IMMUNE FROM SUIT

Defendant State's Attorneys DeLeonardo and Wells assert they are absolutely immune from civil liability for claims arising from their conduct associated with the judicial phase of the criminal process, citing *Imbler v. Pachtman,* 492 U.S. 409, 422-23 (1976) and other federal cases.

However, the "absolute immunity" of prosecutors is not really absolute:

Maryland courts have also adopted the functional approach to absolute prosecutorial immunity. Thus, in Maryland law, when a prosecutor acts as an investigator, he/she is not entitled to absolute immunity. See *Simms v. Constantine*, 113 Md.App. 291, 688 A.2d 1, 5 (D. Md. 1997). *Nero v. Mosby*, 233 F.Supp.3d 463, 483 (2017). (decided under 42 U.S.C. § 1983)

Defendant Wells' conduct was an investigatory function performed, in this case, without regard to the constitutional safeguards afforded Doe. Functioning as an investigator, he applied for a court order compelling Doe to give evidence against herself — her fingerprints and mugshots — without regard to his duty as a constitutional officer to protect her rights. Utilizing *unconstitutional* provisions, where they occur, does not absolve Wells of liability.

MD. RULE 4-263(f)(A) is unconstitutional in that it contravenes Article 22 of Maryland's Declaration of Rights; but further, it pertains *only* to the Circuit Court, and the case against Doe was proceeding in District Court.[12] A Sheriff's deputy, operating as an investigator, would be required to apply for a warrant to obtain evidence from Doe,

---

[12] In that only Doe could request transfer to the Circuit Court, the use of this rule by Defendant Wells was *ultra vires.*

since Doe may not be compelled to give evidence against herself. Operating in an *investigatory* function, Wells similarly was required to apply for a warrant, based upon a sworn affidavit of probable cause, for fingerprints and mugshots of Doe. "In no sense can any investigative activity undertaken ... be deemed to be a part of the judicial function of the State's Attorney's Office." *Simms*, at 15. Defendant DeLeonardo, whose duty is to oversee and direct the employees of his office, failed to properly supervise and train Wells with respect to the constitutional and legal limits of his investigative authority. Accordingly, DeLeonardo is also not immune, as he failed his administrative duties in this respect.

Nevertheless, the Maryland Tort Claims Act governs the immunity of State's Attorneys, and replaces any prior common-law doctrine of immunity with respect to those attorneys, see *infra*; accordingly, Defendant Attorneys have only the qualified immunity afforded by the MTCA.

Judges and Commissioner are not absolutely immune from suit

*Pierson v. Ray,* 386 U.S. 547, 87 S. Ct. 1213 (1967), first established the absolute judicial immunity defense against § 1983 suits, now asserted by Defendant Judges and Defendant Commissioner.

*Pierson v. Ray* relied heavily on *Bradley v. Fisher*, 80 U.S. 335 (1871) a *non*-§ 1983 case which created the judicial doctrine of judicial immunity. It was said in *Bradley* that "[w]here there is no jurisdiction of the subject-matter, any authority exercised is a usurped authority, and for the exercise of such authority, when the want of jurisdiction is known to the judge, no excuse is permissible. But where jurisdiction over the subject-matter is *invested by law in the judge,* or in the court which he holds," the judge will not

be liable for his actions for civil damages. *Id.*, at 351.(emphasis added) This is a direct contrast, however, with *Bradley*'s further holding that even if a judge with general criminal jurisdiction were to "hold a particular act which is not by law made an offense, and proceed to the arrest and trial of the party charged with such act," that act would not be considered, for the purpose of entertaining a lawsuit, to occur outside the judge's general subject-matter jurisdiction, since it would merely be "in excess of his jurisdiction." *Id.,* at 352. At face value, this judicial doctrine establishes the judge above the criminal laws passed by the legislature, apparently able invent offenses without recourse to black letter law (or common law, for that matter).

As dissenting Justice Douglas pointed out in *Pierson*, nothing in the legislative history of § 1983 and its criminal law model, now 18 U.S.C. § 242, indicates that it is not to apply to judges. At the time of its adoption, "[i]t was recognized that certain members of the judiciary were instruments of oppression and were partially responsible for the wrongs to be remedied." Plaintiff largely holds Justice Douglas' position, and notes that the judicial doctrine invented in *Pierson* and reiterated to this day, is erroneous and completely unmoored from § 1983's plain language, legislative history, the history of common law prior to its enactment, and the construction rules provided by Congress in 42 U.S.C. § 1988.

"Acquiescence in an invalid rule of law does not make it valid. *See Brown v. Board of Educ.,* 347 U.S. 483 (1954), *overruling Plessy v. Ferguson,* 163 U.S. 537 (1896)." *United States v. Ekwunoh*, 813 F.Supp. 168, 171 (E.D.N.Y 1993) (internal citations omitted)

Congress has expressly provided for suits against judicial officers

In 1996, Congress passed Pub. L. 104-317, title III, § 309, 110 Stat. 3853. Section 309(a), codified at 28 U.S.C. 2412 note, states:

> (a) Nonliability for Costs — Notwithstanding any other provision of law, no judicial officer shall be held liable for any costs, including attorney's fees, in any action brought against such officer for an act or omission taken in such officer's judicial capacity, unless such action was clearly in excess of such officer's jurisdiction.

The plain language of this enactment, reflected also in amendments added to 42 U.S.C. §§ 1988 and 1983, is "in any action brought against such [judicial] officer for an act or omission taken in such officer's judicial capacity, unless such action was clearly in excess of such officer's jurisdiction."[13]

This language allows for, and contemplates that, judicial officers will be sued under § 1983, and relieves them of any costs awarded in any suit, unless they operated "in excess" of their jurisdiction.

This language does not reflect Bradley and Pierson's opinions that judges are immune from suit until they operate in clear absence of all jurisdiction, but that judges are liable where they operate "in excess" of their jurisdiction.  In passing this law, Congress abrogated the doctrine introduced in Bradley, that judges could not be sued where they operated "in excess" of jurisdiction.

Thus, Congress has already abrogated the judicial doctrine of judicial immunity, but expressly allowing for suits against judges — but for awards of costs only where

---

[13] Section 309(b) amends 42 U.S.C. § 1988 to reflect the provision of Section 309(a), and Section 309(c) amends § 1983 by inserting language consonant with the section above, to wit: "except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was available.

judge exceed their jurisdiction. Accordingly, the Judges, and the Court Commissioner, are not immune from suit in a § 1983 action.

Section 1988 of Title 42 controls construction of § 1983.

Section 1988(a) of Title 42 contains Congress' specific instruction on the construction of § 1983:

> §1988. Proceedings in vindication of civil rights
> (a) Applicability of statutory and common law
> The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes [including § 1983] for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

This statute provides that in *all* cases where § 1983 is deficient in provisions necessary to furnish suitable remedies, the common law, as modified and changed by the constitution and statues of the State where the District Court sits, "***shall*** govern" the said courts in the trial and disposition of the cause."

In Maryland, the immunity defense available for judicial officers and prosecutors is now the same as that for all other public officials. In passing the Maryland State Tort Claims Act, Maryland abrogated the judicial and prosecutorial immunity doctrines, and by the operation of § 1988, the common law, as *modified* by that law of Maryland, provides the appropriate immunity defenses for judges, court commissioners, and prosecutors.

Doctrine of judicial immunity has been abrogated by Maryland Tort Claims Act

It is well established that the Legislature may substitute a statutory remedy for a common law remedy without violating Article 19 of the Declaration of Rights or other Maryland constitutional provisions. *Robinson v. Bunch,* 788 A.2d 636, 645 (2002), citing, *inter alia, Ashton v. Brown,* 339 Md. 70, 104-108 (1995);; *Johnson v. Maryland State Police,* 331 Md. 285, 297 n. 8, (1993); *Ritchie v. Donnelly,* 324 Md. 344, 374 n. 14 (1991); *Branch v. Indemnity Ins. Co.,* 156 Md. 482 (1929); *Solvuca v. Ryan & Reilly Co.,* 131 Md. 265 (1917).

Further, the Legislature may devise a statutory remedy which *abrogates* a judicial doctrine arising from common law. This authority is embodied in Article 5 of the Declaration of Rights, which states, in pertinent part: That the Inhabitants of Maryland are entitled to the Common Law of England, … except such as … may be inconsistent with the provisions of this Constitution; *subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State.* (emphasis added).

Defendants cite *Parker v. State,* 337 Md. 271, 282 (1995) to claim they have well-established absolute judicial immunity against § 1983 claims: "[A] a "judge who has general jurisdictional authority to perform the kinds of acts for which he is sued is absolutely immune from civil liability for those acts."

Of special interest is the accompanying claim in *Parker* that a "suit that is barred by judicial immunity cannot form the basis of a recovery against the State under the Tort Claims Act." *Id.,* at 286. This is a wholly unreasoned dictum: the *Parker* court never considered nor construed the statutory language of the MTCA — *i.e.,* its *actual provisions vis-à-vis* officers of the judicial branch — whatsoever. Instead, the parties,

prior to adjudication, had "agreed that if Judge Brown is immune from suit, then the State of Maryland will not be liable under the Tort Claims Act." *Id.*, at 277. So *Parker* simply recited ancient cases ("string citations") re the "absolute judicial immunity" doctrine to "find" Judge Brown immune, and concluded without basis that the Legislature had made no change to this doctrine. It is those older cases copiously recited by *Parker* which are thus relied upon by Defendants here.

But *Parker **completely failed** to address or decide if judges are *now* immune under the MTCA*, finding instead that a judge *was* immune under the immunity doctrine prevailing *prior to the MTCA*.

"The common law principle of absolute judicial immunity for judicial acts has neither been abrogated nor been modified in Maryland," pronounced *Parker,* at 283.[14] That pronouncement was accompanied by a critical admission which demonstrates the flaw in *Parker* itself:

> The Maryland Declaration of Rights, Art. 5, provides that 'the Inhabitants of Maryland are entitled to the Common Law of England' *except to the extent that the common law has been changed by the legislature* or by this Court.
> *Id.,* n.7 at 291. (citations omitted, emphasis added).

*Simms v. Constantine*, 113 Md.App. 291, 688 A.2d 1, 6-7 (1997) cited the *Parker* pronouncement re judicial immunity and declared it operative with respect to *prosecutorial* immunity — again, without any explication of the provisions of the MTCA. And also again, admitting that the Legislature may abrogate the doctrine of prosecutorial immunity:

---

[14] This sentence, by itself, was quoted in *D'Aoust v. Diamond*, 424 Md. 549 (2012), but that case also did not involve the MTCA and no analysis was done.

One statement made in *Parker v. State* with respect to judicial immunity is equally pertinent to other varieties of governmental immunity: The common law principle of absolute judicial immunity for judicial acts has neither been abrogated nor been modified in Maryland. [] The Maryland Declaration of Rights, Art. 5, provides that "the Inhabitants of Maryland are entitled to the Common Law of England" except to the extent that the common law has been changed by the legislature or by this Court.

Plaintiff agrees with *Parker* and *Simms* that the common law doctrines may be changed by the Legislature, and submits that in the Maryland State Tort Claims Act, Md. Code, State Government §§ 12-101 through 12-110, the Legislature has indeed abrogated the common law principle of absolute judicial immunity for judicial acts and prosecutorial immunity for prosecutorial acts, because it has replaced those common-law principles with a qualified immunity for judicial or prosecutorial acts made in the absence of gross negligence or malice.

Official immunities are forms of sovereign immunity

"[A]ll Government of right originates from the People," according to Article 1 of the Declaration of Rights. In creating the provisions of the Constitution, and in ratifying amendments made to it, the sovereigns of this State — the People — created all branches of the government, and all the State officials within those branches. Thus, all such officials exercise their authority pursuant to the sovereignty of the State, and similarly derive any immunity from tort liability for official acts from the sovereign immunity of the State.

The Legislature has elaborated on this point, finding that the "State is a sovereign political body that the people have established directly for the sole purpose of providing for their government." SG § 12-402(1)(i). "State personnel acting within the scope of their public duties and responsibilities are carrying out a governmental program under

law, and, thus, are *discharging a part of the purpose and sovereignty of the State*." SG § 12-402(2) (emphasis added).

Defendant Judges, Commissioners, Clerks, and Prosecutors are all State personnel as defined under the MTCA: Md. Code, State Government § 12-101(a)(1) (the clerks and judges of the District Court are "State employee[s] or official[s] who [are] paid in whole or in part by the Central Payroll Bureau [of the Treasury]"), SG 12-101(a)(8) ("a State's Attorney of a county, [] or an employee of an office of a State's Attorney"). Under the MTCA, qualified immunity from suit and liability under the MTCA applies to any tortious act or omission committed within the scope of a public employee's duties, unless made with malice or gross negligence. Doe asserts that at a minimum, gross negligence can be inferred from all Defendants' alleged actions.

Because the District Court judge is a creature of the Maryland Constitution under Article IV § 41A and § 41B, and takes office upon the taking of the oath required at Article I, § 9 and § 11, a District Court judge is sworn to uphold the Constitution of Maryland and the Constitution of the United States, which is incorporated into the Maryland Constitution by Article 2 of the Declaration of Rights.

Thus, the judicial branch's authority and position is derived from the people who created the Constitution of Maryland (see Article 1, Declaration of Rights, "all Government of right originates from the People"), and is subject to the Constitution and Laws of this State. It follows that a District Court judge must execute her office in accordance with the Constitution of Maryland; that is, she is subject to the Constitution, since she has taken an oath to support it and bear allegiance to it.

As a creature of the Constitution, then, a judge may not abrogate any of the provisions of the Declaration of Rights — including Article 25 (forbidding excessive bail) and Article 22 (concerning the right not to be compelled to give "evidence" against oneself in a criminal matter) — through the exercise of her judicial functions. Such authority, power, or jurisdiction (terms which are essentially synonymous) *is not* held by the judge. If it were otherwise, the judge would be placed *above* the law which grants her jurisdiction, rather than operating within her function of *applying* the written law, including the Constitution, and her duty to enforce the provisions of the Declaration of Rights with respect to each person who appears before her in court.

Where a judge, in exercising judicial function, in fact violates the Constitutional provisions safeguarding the people, as has been alleged here, the judge therefore acts in the *absence* of all jurisdiction.

Further, Md. Rule 4-263(f)(A) is unconstitutional in that it contravenes Article 22 of Maryland's Declaration of Rights; it pertains *only* to the Circuit Court, and the case against Doe was proceeding in District Court.[15] Accordingly, Defendant Ellinghaus-Jones, a District Court judge, was operating in the absence of jurisdiction when she ordered Doe, under that Rule, to appear and produce her fingerprints and mugshots, evidence which was explicitly sought to provide a link in a chain of evidence intended to be used in the criminal prosecution of Doe.

Nevertheless, because the MTCA governs the immunity of District Court judges, and replaces any prior common-law doctrine of judicial immunity, Defendant judges have only the qualified immunity afforded by the MTCA.

---

[15] In that only Doe could request a transfer to the Circuit Court, the use of this Circuit Court rule by the Defendant Wells was *ultra vires.*

<u>Plaintiff has stated claims for relief against Sheriff and Warden</u>

With respect to claims against Sheriff DeWees and Warden Hardinger for supervisory liability (Counts 9, 28, 29, and 30), Defendants rely heavily on *Shaw v. Stroud*, 13 F.3d 719 (4th Cir. 1994) (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) to state that Doe has a "heavy burden of proof" to establish that these Defendants have acted with deliberate indifference and continued inaction in the face of documented widespread abuses. Defendants are mistaken that Plaintiff has any burden of proof as of yet. Notably *Stroud* and *Slaken* were determined on summary judgment motion, not a motion to dismiss on the facts shown in the complaint. It is not the purpose of a Complaint to *prove* the facts, but only to present notice of the facts such that they appear plausible — that is, they appear reasonable on their face, or they can be reasonably inferred from other facts. Doe has set forth facts which demonstrate that Sheriff DeWees had personal knowledge of his subordinate's actions, and that Warden Hardinger also had personal knowledge of his subordinate's actions, and the facts that they are in supervisory positions responsible for their subordinates' actions.

<u>Plaintiff has stated claims for relief in Counts 25 and 26</u>

Defendants say there is no basis for Doe's claim based on Maryland v. King, 569 U.S. 435 (2013). *Maryland v. King* is inapposite; there is no law in Maryland requiring detainees or arrested persons to pose for mugshots or to give up fingerprints. This is the gravamen of Count 15 — that even though no warrant to seize fingerprints was obtained by COs, who are not investigators or deputies, they forcibly seized her and tried to obtain fingerprints. The order of the Judge to provide fingerprints was to Doe, and provided no legal warrant for Defendants' actions against her.

Defendants further claim that Count 26 fails because the detention center does not need probable cause to search an inmate's cell or belongings. This applies to prisoners and inmates, but not to detainees who are presumed innocent, for the purpose of obtaining evidence to be used against them in a criminal case outside of the confines of the detention center.

Governmental defendants fail to establish qualified immunity

Defendants suggest that all governmental defendants enjoy qualified immunity from Plaintiff's federal claims, and assert that unless plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before discovery, citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

A claim of immunity is an *affirmative defense* to suit, and the burden is on Defendants to demonstrate that facts pled in Plaintiff's complaint, articulating various violations of the Bill of Rights, do not actually constitute violations because they are not at the same time "clearly established" at law. *Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir.2007) *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir.2003) ("The burden of proof and persuasion with respect to a claim of qualified immunity is on the defendant official."); *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003) (same); *Tanner v. Hardy*, 764 F.2d 1024, 1027 (4th Cir. 1985) ("It is a well established principle that qualified immunity ... is a matter on which the burden of proof is allocated to the defendants."); *Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981) (good faith immunity of individual police officers is an affirmative defense to be proved by defendant); *Dennis v. Sparks*, 449 U.S. 24, 29, 101 S. Ct. 183 (1980) (noting that in a § 1983 action "the burden is on the official claiming immunity to demonstrate his

entitlement").

Rather than meeting this burden by demonstrating any particular entitlement to qualified immunity, Defendants generally assert that Plaintiff has failed to articulate any violations of constitutional rights, or to plead facts that "could plausibly establish that any constitutional right was clearly established at the time of any individual officer's violations thereof." (p. 42). Plaintiff cannot know where to begin to respond to this vague statement. It appears merely an attempt to shift Defendants' burden of establishing qualified immunity defenses to Plaintiff, and fails to assert any specific qualified immunity defense for any specific governmental official.   Defendants have not shown entitlement to any qualified immunity defense, and this complaint should not be dismissed on that basis.

Further, a right is "clearly established" if "'the contours of the right [are] sufficiently clear'" so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right. *Bailey v. Kennedy*, 349 F.3d 731, 740 (4th Cir. 2009). While the determination of whether a right is "clearly established" is made with reference to the decisional law, the non-existence of a case holding the defendant's identical conduct to be unlawful does *not prevent denial of qualified immunity*; qualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations. *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003).

County actors do not enjoy immunity from suit under Maryland law

Doe has not brought any claims to this Court under the Maryland's State Tort Claims Act or Maryland's Local Government Tort Claims Act. Accordingly, the

assertions at Mot., pp. 42-43 concerning statutory State personnel immunity are inapposite.

To the extent that Maryland law may be said to control deficiencies in sns 1983 (see § 1988), Correction officers *are* entitled to a *type* of statutory immunity under MD. CODE, CTS. & JUD. PROC. ("CJP") § 5-507: "while acting in a discretionary capacity, *without malice*, and *within* the scope of the official's employment or authority," they "shall be immune as an official or individual from any civil liability for the performance of the action." (emphasis added) Such "immunity" only extends to "civil liability," however, not to any type of immunity *from suit.* In other words, the warden's and correction officers' "immunity" depends upon the circumstances and motivations of their actions, as established by the evidence at trial. See, *e.g, Scheuer v. Rhodes,* 416 U.S. 232, 238-39 (1974). Such "immunity" cannot be asserted in a motion to dismiss.

In *Ashton v. Brown*, 339 Md. 70 (1995), the Court of Appeals described the unique nature of the Local Government Tort Claims Act ("LGTCA"), concluding that does not give local officials such as the correction officers or the warden any immunity from liability, but merely certain immunities *from paying a judgment.* See *Id.* at 104, 107-08. Thus, the LGTCA shifts financial responsibility from the local official to the local government employer, *without expanding the common law public official immunity* available to such officials. Thus, a defendant public official of a municipal corporation (here, Carroll County government) who commits a tort *within* his scope of employment may be found to have committed such tort by a jury, but the plaintiff must execute such judgment, in the absence of malice, against the municipal corporation. See CJP § 5-303. Accordingly, the employees — here, the correction officers and warden —may not be

dismissed, because the Carroll County government is liable for a judgment found *against those employees* where, as here, Plaintiff Doe gave notice of a claim under the LGTCA within the then-statutory limit of six months to the Carroll County government.

Further, "actual malice" is defined by the Local Government Tort Claims Act, at CJP § 5-301(g) as "ill will or improper motivation." In *Shoemaker v. Smith,* 725 A. 2d 549, 560 (1999), the Court of Appeals succinctly described "malice" as a tort "motivated by ill will, by an improper motive, or by an affirmative intent to injure." Here, Plaintiff Doe alleges that Defendant correction officers, and Defendant Hardinger, did not deprive Doe *negligently*, but that they individually, and collectively working together, *intended* to deprive Doe of food, sleep, exercise, hygiene, religious exercise, legal materials, etc. order to cause emotional pain, suffering and distress to Doe.  Doe alleges, in sum, that they intended to make it so painful for Doe to continue to exercise her Fifth Amendment right not to give evidence against herself (here, the confession of a name) that she would abandon that right to gain emotional and physical relief. At any rate, Defendant correction officers are not entitled to dismissal on the ground of "to the extent" claims are "construed" as sounding in negligence. Where Plaintiff alleges intentional conduct and improper motivation, it is for the jury to decide whether each individual officer acted intentionally for an improper purpose, or with gross negligence, or with "ordinary" negligence under the circumstances.  Accordingly, Defendants Warden Hardinger and the Correction Officers are not due to be dismissed.

Finally, under the common law, public officials are not immune from suit, but are personally liable for compensatory damages for violations of plaintiffs' rights under the Maryland Constitution. Further, violations of Maryland's Declaration of Rights may be

redressed through common law actions for damages. *See Ritchie v. Donnelly*, 324 Md. 344, 369-373 (1991). *Ritchie* recognized that immunity from suits based on violations of the Maryland Constitution has been consistently denied, summarizing at 370-371:

> This Court has consistently held that a public official who violates the plaintiff's rights under the Maryland Constitution is personally liable for compensatory damages .... Liability has been imposed upon the government official when his unconstitutional actions were in accordance with or dictated by governmental policy or custom. Liability has also been imposed when the unconstitutional acts were inconsistent with governmental policy or custom. [all internal citations omitted]

Plaintiff Doe has alleged and stated claims for constitutional violations of her rights by all Defendant COs and Defendant Warden. Accordingly, those Defendants are not due to be dismissed.

Colorado River Abstention is unwarranted

The Colorado River Abstention is unwarranted here. This federal case concerns claims based on § 1983, while the State cases concern claims made pursuant to State jurisdiction and common law. Accordingly, the jurisdictions invoked are State and Federal, respectively. Furthermore, the two State claims were filed effectively three days and one day, respectively, before the claims filed in this Court, and since Doe has stated that no claims are time-barred, they are, for all purposes, filed nearly simultaneously. In this case, however, the issue of Doe's name has been decided, and the case is proceeding; in the State Courts, the issue of Doe's name is the sole reason for case dismissal, and those dismissals are yet being appealed. Thus, this case is advanced of the State court cases, at this time.

## CONCLUSION

For the reasons set forth above, the Plaintiff respectfully requests that the Defendants' Rule 12(b)(6) motion to dismiss the Complaint be denied in its entirety.

Respectfully submitted,

Jane Doe: _____ Her Mark
Jane Doe, CCDC #25361
c/o LWRN
5 South Center Street, #1100
Westminster, MD 21157
410-857-5444
lwrn@mail.com

### Certificate of Service

I hereby certify that on this 1st day of October, 2015, a copy of Plaintiff's Opposition to Defendants' Motion to Dismiss was sent by first class mail, postage prepaid, to:

Kevin M. Cox
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202

Jason L. Levine
Local Government Insurance Trust
7225 Parkway Drive
Hanover, MD 21076

Wendy L. Shiff
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202

Sharon E. Conners
Marks, O'Neill, O'Brien, Doherty & Kelly
600 Baltimore Avenue, #305
Towson, Maryland 21204

Jane Doe _____ Her Mark
Jane Doe, CCDC #25361