# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

JANE DOE,

      Plaintiff,

      v.

JAMES T. DeWEES,
SHERIFF OF CARROLL COUNTY, *et al.*,

      Defendants.

Civil Action No. TDC-18-2014

## MEMORANDUM OPINION

Plaintiff Jane Doe, a Maryland resident, has filed a civil rights action against various Maryland state and local government actors in connection with her arrest and detention on June 27, 2015 by Deputy Sheriffs of the Carroll County, Maryland Sheriff's Office after a traffic stop during which she refused to give them her name. Doe asserts causes of action against all Defendants in their individual capacities, and against Defendants who are local government personnel in their official capacities, for violations of her rights under the United States Constitution pursuant to 42 U.S.C. § 1983, and for violations of the Maryland Declaration of Rights. Presently pending before the Court is Defendants' Motion to Dismiss. Upon review of the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Doe, who actually goes by the name "Jane Doe," is a citizen of the United States and a Maryland resident. Am. Compl. at 10, ECF No. 18. After her arrest by Deputy Sheriffs Ben Craft,

Douglas Kriete, and Daren Metzler on June 27, 2015, she was detained at the Carroll County Detention Center ("CCDC") in Westminster, Maryland until September 1, 2015. Based on those events, Doe has filed suit against the following 60 named Defendants in their individual capacities: James T. DeWees, Sheriff of Carroll County; Deputy Sheriffs Craft, Kriete, and Metzler (collectively, "the Deputy Sheriff Defendants"); Brian DeLeonardo, State's Attorney for Carroll County, and Adam G. Wells, Assistant State's Attorney for Carroll County ("collectively the Prosecutor Defendants"); Judge Mary C. Reese of the District Court of Maryland for Carroll County ("the District Court") and retired Judge JoAnne Ellinghaus-Jones of the District Court (collectively, "the Judge Defendants"); District Court Administrative Commissioner Megan Dickerson and District Court Commissioner Michele Miner (collectively, "the Commissioner Defendants"); District Court Administrative Clerk Mary K. Smith and District Court Clerks Kathryn Glenn, Brenda S. Storey, Cathy A. Haines, E. M. Arnold, Frances A. Byan, Rebecca L. Elligson, John F. Glorioso, Tracey L. Leister, Jennifer A. Levee, Nellie M. Long, Frances M. Noel, Cynthia M. Sizemore, Johanna L. Steed, and Catherine Pilo, also known as Catherine Adkins (collectively "the Clerk Defendants"); George Hardinger, Warden of CCDC; CCDC Correctional Officers ("COs") Amanda Blizzard, Wade Bolner, C.S. Wendell Highsmith, Jr., Chester L. Arnott, Cheyenne Lee, Craig Koerner, Dennis Harmon, Garth Mays, John Bowen III, Joshua Boschert, Kenneth Chesgreen, James Cerny ("J. Cerny"), Kristy Cerny ("K. Cerny"), Larry Naill, Jr., Michael Andrews, Michael E. Boyd, Michael Green, Michael L. McCrea, Lonnie J. Jersild, Nadia Medevich, Paula Hyde, Robin L. Shorb, Wesley L. Davis, Ashley Morrell, Teresa L. Bosley, Tony L. Mummert, Tracy Lillehaug, Judy Warner, A. Parks, and Robert E. Smith, Jr. (collectively, "the CO Defendants"); CONMED Healthcare Management, LLC ("CONMED"); and CONMED Contractors Britnie Boschert, Rochelle Herman, and Joyce Schaum (collectively, "the CONMED

Contractor Defendants"). Doe has also asserted claims against six unidentified CCDC correctional officers in their individual capacities. For purposes of resolving the Motion, the Court accepts the facts asserted in Doe's Amended Complaint as true.

## I.      The Arrest

On June 27, 2015, at approximately 1:30 a.m., Doe was driving in Westminster, Maryland when she became aware of flashing lights in her rearview mirror. Doe proceeded to find an appropriate place to pull over and stopped at a red light. Deputy Sheriff Craft also stopped his vehicle and approached Doe's window to question her. Deputy Sheriff Craft first told Doe that he had stopped her because she had a tag light out, then stated that it was a tail light that was out. Doe asserts that both statements were false.

After Deputy Sheriffs Kriete and Metzler arrived at the scene, Deputy Sheriff Craft reached through Doe's open window, unlocked and opened Doe's car door, and unclasped her seatbelt. Deputy Sheriff Craft forcibly pulled Doe out of the car by her arm, and the Deputy Sheriff Defendants twisted her arms behind her back, handcuffed her, and put her in the back seat of Deputy Sheriff Craft's vehicle. The Deputy Sheriff Defendants then proceeded to search Doe's car and removed a number of items, including multiple flash drives. When Doe tried to get the Deputy Sheriff Defendants' attention because she needed to urinate, Deputy Sheriff Craft warned her not to urinate on the vehicle's seat, then tied her ankles together. Doe was then transported to CCDC. According to Doe, Deputy Sheriff Craft acted in a "belligerent, aggressive, unreasonable, and erratic manner" toward Doe throughout the encounter. *Id.* at 13.

## II.     The Charges

In the early morning hours of June 27, 2015, Doe was placed into a booking cell at CCDC According to Doe, the flash drives taken from her car were uploaded onto computers, and CO

McCrea told Deputy Sheriff Craft over the phone that "tech" had found something with which to identify Doe. *Id.* at 32. CO Boyd and CO Bolner used a computer in Central Booking to draft an application for a search warrant for her handbag and the flash drives. CO McCrea consulted by telephone with Deputy Sheriff Craft multiple times about the document.

At some point after 7:00 a.m., Deputy Sheriff Craft returned to Central Booking and asked whether Doe had told anyone her name yet. When CO McCrea told Deputy Sheriff Craft that she had not volunteered any information, Deputy Sheriff Craft stated, "if that's the way she wants it, we'll play that game." *Id.* at 26. According to Doe, with CO McCrea's assistance, Deputy Sheriff Craft intentionally drafted a statement of probable cause, a statement of charges, and a citation against Doe based on false information in order to punish Doe for exercising her right to remain silent and to pressure her to abandon that right and plead guilty. Deputy Sheriff Craft proposed that Doe be charged with operating a vehicle without rear red reflectors, eluding police, failing to pull to the curb, failing to obey a lawful order, resisting arrest, and obstructing or hindering the police. Doe asserts that Sheriff DeWees knew or should have known that Deputy Sheriffs were conducting unlawful searches and arrests and that they and COs were fabricating charges against individuals like Doe.

### III. Court Proceedings

On June 27, 2015 between 10:00 a.m. and 11:00 a.m., Doe was taken from the booking cell to an initial appearance before Commissioner Miner. Doe refused to provide her name to Commissioner Miner and stated that she had a constitutional right not to give evidence against herself. Commissioner Miner informed Doe that she would not set bail unless Doe provided her name because Doe could be a sex offender and thus would not be subject to release. When Doe continued to refuse to identify herself, Commissioner Miner deemed Doe "recalcitrant,"

terminated the proceeding without determining whether there was probable cause for the arrest, and ordered her held without bail. *Id.* at 43. Doe was then returned to CCDC from June 27, 2015 to June 30, 2015. According to Doe, Administrative Commissioner Dickerson failed to exercise adequate supervision to prevent Commissioner Miner's actions and encouraged a policy of refusing to set bail for those who exercise their rights under the Fifth Amendment.

On June 30, 2015, Doe had a hearing before Judge Reese by closed-circuit television during which she was represented by counsel. When Judge Reese asked Doe to provide her name, address, date of birth, and social security number, Doe refused. Judge Reese set bail at $500,000 in cash. According to Doe, Judge Reese did not allow her attorney to respond to the prosecution's arguments and set the bail to punish Doe for refusing to identify herself. Doe was returned to CCDC and then remained in pretrial detention from June 30, 2015 through September 1, 2015.

On July 7, 2015, Doe had a hearing by closed-circuit television before Judge Ellinghaus-Jones. The public defender refused to represent her because she would not identify herself. Judge Ellinghaus-Jones told Doe that the purpose of the hearing was to obtain identifying information in order to run her criminal record; that Doe did not have a Fifth Amendment right to remain silent as to questions about her identity; and that she would not be released pending her trial unless she provided identifying information. When Doe continued to refuse to give her name or address, Judge Ellinghaus-Jones told her that she would not change the $500,000 bail amount. According to Doe, Judge Ellinghaus-Jones denied Doe's requests for orders that the public defender represent her and that CCDC allow her two hours per day of access to legal materials in order to be able to defend herself.

On July 9, 2015, Assistant State's Attorney ("ASA") Wells filed a motion in the District Court for an order to compel Doe to submit to full intake procedures, including submitting to

photographing and fingerprinting, in order to determine Doe's identity and any possible criminal background.  On July 20, 2015, Judge Ellinghaus-Jones ordered Doe to submit to these intake procedures under threat of contempt.

## IV.    Photographing and Fingerprinting

On July 21, 2015, pursuant to Judge Ellinghaus-Jones's order, Warden Hardinger and COs Highsmith, Mays, Koerner, Warner, Davis, and Morrell physically compelled Doe to have her mugshot taken and attempted to use force to obtain Doe's fingerprints.  CO Davis put his hand on Doe's forehead and forced her head up so the photograph could be taken, and the other COs attempted to grab her hands so fingerprints could be taken.  When she made fists with her hands, the COs gave up on trying to take her fingerprints.  On July 30, 2015, after CO Harmon and other unidentified COs removed Doe from her cell, unidentified personnel removed Doe's possessions from her cell in order to acquire latent fingerprints to be used to identify her.  Among the items removed was an empty shampoo bottle that Doe used as a hot water bottle to alleviate pain from a cracked tooth.

## V.    Pretrial Detention Conditions

According to Doe, while she was in pretrial detention at CCDC, the CO Defendants violated her constitutional rights, in her view because she refused to identify herself.

### A.    Suicide Watch

Doe asserts that COs Blizzard, Medevich, and Cerny, as well as CONMED Contractors Schaum and Herman, improperly placed her on suicide watch from June 29, 2015 to July 6, 2015. During an interview by Contractor Schaum on June 29, 2015, Doe refused to identify herself, and when asked what she thought about suicide, she responded that as a Christian she believed "suicide is usually demonically influenced." *Id.* at 78.  When asked whether she was suicidal at that time,

Doe responded by referring Contractor Schaum to her previous answer. When asked whether she had any history of drug abuse, trauma, or physical abuse, Doe refused to answer. After Contractor Schaum decided to place Doe on suicide watch because of the lack of sufficient history, Doe was told to change into a padded "suicide suit" secured by Velcro. *Id.* at 79-80. When she refused to do so, the COs forcibly put her in the suit. Warden Hardinger took Doe off of suicide watch status on the evening of July 6, 2015.

### B. Nutrition

Doe alleges that from June 27, 2015 to July 1, 2015, COs served her meals containing gluten, even though she told them that she had a gluten allergy. Although Doe began receiving gluten-free meals after July 1, 2015, she further asserts that on July 17, 2015, CONMED Contractor Boschert warned her that she would resume giving Doe the normal inmate diet containing gluten unless Doe provided a doctor's note attesting that she is allergic to gluten. According to Doe, at least three meals she received from July 17, 2015 to September 1, 2015 contained some gluten.

Doe also alleges that from July 1 to July 10, 2015, she informed CCDC staff and medical personnel that she required extra dietary oils and vitamin C to maintain her health but that, although she received approximately 500-1,000 milligrams of vitamin C from medical staff, she did not receive appropriate dietary oils while detained.

### C. Sleep, Showers, Recreation, and Visitation

Doe further alleges that: (1) from June 27, 2015 to July 6, 2015, COs intentionally prevented Doe from sleeping by keeping her in a booking cell that was exposed to noise and light; (2) from June 27, 2015 through July 6, 2015, COs allowed Doe to take only one shower, provided inadequate materials to clean or groom herself, and allowed her naked body to be exposed to male

COs, including over surveillance video; and (3) from June 27, 2015 to July 3, 2015, COs did not permit Doe to have recreation, fresh air, and exercise outside of the booking cell. Doe further asserts that COs did not give her the opportunity to complete an Approved Visitation List, and when she told them on July 20, 2015 to consider any visitors to be on such a list, they nevertheless did not allow her friends to visit with her.

### D. Religion

Doe asserts that from June 27, 2015 to July 5, 2015, COs refused to provide Doe with a Bible despite her repeated requests and prevented her pastor from visiting her after July 22, 2015. According to Doe, Warden Hardinger instructed CCDC personnel not to allow Doe's pastor to visit her after July 22, 2015 once the pastor informed him that he had no information to give about Doe's identity.

### E. Legal Resources

Doe alleges that COs provided her with inadequate resources to address her legal matters. She asserts that from June 27, 2015 to July 5, 2015, she received only 30 minutes with access to her charging documents and writing materials in order to work on her legal case. More broadly, she alleges that from June 27, 2015 to September 1, 2015, she was allowed to visit the law library only six times for one hour per week and had no access to a typewriter or computer. Doe also contends that on July 15, 2015, COs made her attorney wait up to two hours before being allowed to visit with her and that on other occasions, COs eavesdropped on her legal phone calls.

### F. Health Hazard

Finally, according to Doe, during her detention, one or more inmates contracted scabies, and because Warden Hardinger intentionally withheld information about the outbreak from inmates, she did not take appropriate medical measures after her release and contracted scabies

about one week later. She also asserts that the lack of appropriate nutrition, dietary oils, and vitamin C during her pretrial detention caused her to develop a staph infection that, along with the scabies, caused her serious health problems for eighth months after her release.

**VI.    Release**

According to Doe, her continued imprisonment from August 20, 2015 through September 1, 2015 was caused by the Prosecutor Defendants. Specifically, on July 24, 2015, Doe submitted a motion through counsel requesting that Judge Ellinghaus-Jones's July 20, 2015 order be vacated. On August 19, 2015, ASA Wells filed a response acknowledging that Doe's fingerprints obtained from her cell had been submitted for comparison and returned a negative result. Despite this knowledge, ASA Wells continued to oppose vacating or revising the July 20, 2015 Order, on the grounds that she still might be a fugitive or subject to outstanding warrants. Then, on August 28, 2015, two business days before Doe's scheduled trial on September 1, 2015, all ten charges against Doe were dismissed by the State's Attorney by *nolle prosequi*. According to Doe, the Prosecutor Defendants dropped the charges at that time so that Doe would have spent two months in jail.

According to court records, the *nolle prosequi* was filed on Friday, August 28, 2015 at approximately 9:15 a.m., and a Release from Commitment Order ("the Release Order") was printed and placed in Doe's case file at approximately 9:38 a.m. that day. Clerk Storey mailed a Notice of Nolle Prosequi and Notice of Cancellation of the September 1, 2015 trial to Doe's address and entered those orders into the District Court computer system. However, Clerk Storey did not sign the Release Order and fax it to CCDC, or otherwise notify CCDC of that order that day or on Monday, August 31, 2015. Doe was not aware of the *nolle prosequi* until Tuesday, September 1, 2015, when she was not called out of her cell to attend her trial. When she asked CO Mummert why she had not been called for trial that day, he left the unit to check and returned

to report that CCDC had received a fax stating that she was not needed for trial.  When Doe's pastor went to CCDC to inquire about her status, a CO told him that CCDC did not have release papers for Doe.  After inquiry to the District Court by Doe's pastor and friends, the District Court Clerk's Office faxed the Release Order, signed by Clerk Glenn, to CCDC at 9:59 a.m. on September 1, 2015.  Doe was then released.

**VII.    Procedural History**

On July 2, 2018, Doe filed her original Complaint in this Court.  On April 25, 2019, Doe filed an Amended Complaint which asserts claims pursuant to 42 U.S.C. § 1983 across 35 counts for violation of her rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Articles 2, 21-22, 24-26, 36, and 45 of the Maryland Declaration of Rights.  Specifically, Doe has filed suit against the named Defendants in their individual capacities and the local government actors in their official capacities for federal and state constitutional violations arising from her arrest, detention, and prosecution following the events of June 27, 2015, and from various alleged deprivations of basic needs while in pretrial detention at CCDC.  As is apparent from the Amended Complaint, and as clarified in her memorandum in opposition to the Motion to Dismiss ("Opposition"), Doe has not asserted state common law tort claims.  Doe seeks compensatory damages, punitive damages, costs, and the return or destruction of any fingerprints or electronic information illegally obtained and retained by Defendants on any computers or servers.

**DISCUSSION**

**I.      Motion to Extend Time to Serve Process and Deem Service Timely**

On February 20, 2020, Doe filed a Motion for Extension of Time to Serve Process and Deem Service on Defendants Herman and Glorioso Timely under Federal Rule of Civil Procedure

4(m).  In that motion, Doe asks the Court to accept late service of process on Contractor Herman and Clerk Glorioso.  The Motion is unopposed.  Pursuant to the Court's February 11, 2019 Order, service was required to be effectuated on all Defendants by May 12, 2019.  Contractor Herman and Clerk Glorioso were served on May 13, 2019 and May 14, 2019, respectively.  Where the Defendants have not objected to Doe's Motion and Doe has demonstrated good cause, the Court will grant Doe's Motion.

## II.    Motion to Dismiss

In their Motion, Defendants seek dismissal of the Amended Complaint in its entirety on the grounds that:  (1) "Jane Doe" is a pseudonym which does not identify the real party in interest to this action; (2) the Judge Defendants, the Commissioner Defendants, the Clerk Defendants, and the Prosecutor Defendants are entitled to absolute immunity from Doe's claims; (3) any official capacity claims against local government actors are not cognizable under § 1983; (4) many of Doe's claims are time-barred by the applicable statute of limitations, including as to certain Defendants added as parties only in the Amended Complaint; (5) Doe has failed to allege sufficient facts to state plausible claims for relief; (6) Defendants are entitled to qualified immunity; and (7) in the alternative, the Court should abstain from exercising jurisdiction over this case pending resolution of two related state court actions on appeal before the Maryland Court of Special Appeals.

### A.    Legal Standards

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Although courts

should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Maryland courts construe many of the Articles of the Maryland Declaration of Rights relevant to Doe's claims *in pari materia* with the comparable provisions of the United States Constitution. *Parker v. State*, 936 A.2d 862, 870 (Md. 2007) (stating that Article 26 has been held *in pari materia* with the Fourth Amendment); *Widgeon v. E. Shore Hosp. Ctr.*, 479 A.2d 921, 927 (Md. 1984) (stating that Articles 24 and 26 have consistently been held to be *in pari materia* with the Fourth, Fifth, and Fourteenth Amendments); *Andrews v. State*, 436 A.2d 1315, 1317 (Md. 1981) (acknowledging that the Fifth Amendment and Article 22 have been recognized as being *in pari materia*); *see also State v. Campbell*, 870 A.2d 217, 223 n.3 (Md. 2005) (stating that the right to counsel provisions in Article 21 are *in pari materia* with the Sixth Amendment); *Aravanis v. Somerset County*, 664 A.2d 888, 893-94 (Md.1995) (observing that Article 25 is in *pari materia* with the Eighth Amendment). Thus, the Court will review the federal and state constitutional claims together.

### B.     Real Party in Interest

Defendants argue that Doe's claims should be dismissed because she has not demonstrated that she is the real party in interest to this action as required by Federal Rule of Civil Procedure 17, where she has failed to confirm her true identity by providing any government-issued identification or proof of a legal name change, or to satisfy the test outlined in *James v. Jacobsen*,

6 F.3d 233, 238 (4th Cir. 1993), for proceeding in a case pseudonymously. Fed. R. Civ. P. 17(a)(1) ("An action must be prosecuted in the name of the real party in interest.").

Where Doe argues that "Jane Doe" is not a pseudonym but instead is the name she uses in everyday life, Defendants' arguments that Doe may not use a pseudonym are not relevant. Although Doe has not shown that Jane Doe was her name at birth or that she legally changed her name to Jane Doe, "Maryland recognizes common law name changes," and "[n]either the statutory or common law method is . . . the exclusive manner in which a name may be changed." *Torbitt v. State*, 650 A.2d 311, 314 (Md. Ct. Spec. App. 1994) (citing *Stuart v. Bd. of Supervisors of Elections*, 295 A.2d 223 (Md. 1972)). "[A]bsent a statute to the contrary," there is a common law right of any person "to adopt any name by which [a person] may become known, and by which [that person] may transact business and execute contracts and sue or be sued." *Stuart v. Bd. of Supervisors of Elections*, 295 A.2d 223, 226 (Md. 1972). "[T]his [is] without regard to [one's] true name." *Romans v. State*, 16 A.2d 642, 646 (Md. 1940). Such adoption and use of another name has been approved where it is "consistent" and "nonfraudulent." *See, e.g.*, *Stuart*, 295 A.2d at 226 (noting that a woman may use a surname other than her husband's where it is used consistently and nonfraudulently, and that "a man may lawfully change his name without resorting to legal proceedings and by general usage or habit acquire another"); *Romans*, 16 A.2d at 646 (stating that a person may be prosecuted under an adopted or assumed name). With respect to prosecution of a crime, "the name is only material for its evidentiary value to make certain the particular person charged with the offense." *Romans*, 16 A.2d at 646.

Here, Doe alleges in the Amended Complaint that "Jane Doe" is in fact her name, and she reiterates in her Opposition that it is not a pseudonym. Am. Compl. at 10. Doe previously submitted affidavits from other individuals attesting that Doe actually went by the name "Jane

Doe" prior to the events in question. At this early stage of the litigation, the record before the Court does not allow for a finding that Doe's use of the name "Jane Doe" is not consistent or for fraudulent purposes. Accordingly, the Court will deny the Motion as to this argument. However, in discovery, Defendants may engage in factual development on the issue of Doe's legal name and identity, and Doe will be expected to demonstrate that the use of her preferred name, "Jane Doe," has been consistent and not for fraudulent purposes or a reason contrary to Maryland common law.

### C. Absolute Immunity

Defendants argue that certain counts should be dismissed because the Judge Defendants, the Commissioner Defendants, the Clerk Defendants, and the Prosecutor Defendants are entitled to immunity. Doe argues that these Defendants are not immune from suit because absolute immunity has been abrogated for judges in Maryland, and the Judge Defendants and the Commissioner Defendants acted in excess of their jurisdiction; the Clerk Defendants were not protected by immunity when they failed to carry out a ministerial duty by delaying the transmission of the Release Order to CCDC; and the Prosecutor Defendants engaged in investigatory rather than prosecutorial conduct in seeking to compel her fingerprints and photograph.

### 1. Judge Defendants

Upon review of the Amended Complaint, the Court finds that the Judge Defendants are immune from the claims against them in Counts 18-24. Absolute immunity extends to judges for conduct in their capacities as judges. *See Forrester v. White*, 484 U.S. 219, 226-27 (1988). Judges are not liable in civil actions for damages for their judicial acts, "even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." *Stump v. Sparkman*, 435 U.S. 349, 355-56 (1978); *see Dean v. Shirer*, 547 F.2d 227, 231 (4th Cir. 1976) (stating that a judge may not be attacked for exercising judicial authority even if done improperly).

The bar of absolute judicial immunity may be overcome in two limited sets of circumstances: (1) for nonjudicial actions, consisting of "actions not taken in the judge's judicial capacity"; and (2) "for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991). A judge acts in a judicial capacity when the function is one "normally performed by a judge" and when the parties "dealt with the judge in [his or her] judicial capacity." *Stump*, 435 U.S. at 362. The "relevant inquiry is the 'nature' and 'function' of the act, not the 'act itself.'" *Mireles*, 502 U.S. at 12-13 (quoting *Stump*, 435 U.S. at 362). Courts thus look to an "act's relation to a general function normally performed by a judge" to determine whether the act was judicial. *Id.* at 13. Absent those circumstances, judicial immunity bars a claim for monetary damages against a judge.

Here, neither exception to judicial immunity applies. Doe's claims against the Judge Defendants arise from rulings made in their judicial capacity during Doe's initial appearance and bail hearings, and from subsequent orders directing Doe to provide identifying information, fingerprints, and a photograph to determine her identity. The Judge Defendants performed functions "normally performed by a judge," including presiding over criminal hearings, setting and reviewing bail conditions, and issuing orders resolving pretrial motions. *See Stump*, 435 U.S. at 357 n.7, 362. There are no plausible allegations that the Judge Defendants engaged with Doe in a non-judicial capacity or acted in excess of their jurisdiction. Accordingly, the claims against the Judge Defendants must be dismissed.

### 2. Commissioner Defendants

Likewise, absolute immunity extends to the Commissioner Defendants for the claims against them in Counts 10 and 11. In Maryland, District Court Commissioners are judicial officers, Md. Rule 4–102(f) (2019), who are appointed by the judiciary and whose duties include

issuing arrest warrants, setting bail, and making probable cause determinations. Md. Code Ann., Cts. & Jud. Proc. § 2–607(a)(1), (c) (Supp. 2019). Doe's claims against the Commissioner Defendants arise from performing exactly these judicial functions or, in the case of Administrative Commissioner Dickerson, failing to supervise another Commissioner in a way that would have prevented the judicial decisions at issue. Where there are no plausible allegations in the Amended Complaint that the Commissioner Defendants acted as non-judicial officers or in excess of their jurisdiction, the claims against them must be dismissed.

### 3. Clerk Defendants

Defendants argue that the Clerk Defendants are also entitled to absolute judicial immunity from the claims in Counts 34 and 35 that they contributed to Doe's unlawful detention from August 28, 2015 to September 1, 2015 by delaying the transmission of the Release Order to CCDC.

Court clerks in Maryland state courts are afforded derivative judicial immunity when acting "in obedience to a judicial order or under the court's direction." *McCray v. Maryland*, 456 F.2d 1, 5 & n.11 (4th Cir. 1972). However, court clerks are generally not entitled to immunity from liability under § 1983 for "the failure to perform a required ministerial act such as properly filing papers" and "[c]lerical duties," because court clerks are "not called upon to exercise judicial or quasi-judicial discretion" in carrying out such tasks. *Id.* at 3-4. When acting in excess of their lawful authority or in failing to follow the court's order, court clerks are "entitled to no more protection than any other state ministerial functionary who fails to discharge a mandatory duty." *Id.* at 5.

Here, the defense of judicial immunity is not available to the Clerk Defendants where Doe alleges a failure to perform a clerical duty in a timely manner. Doe does not allege that the decision to release her, or the contents of the Release Order, violated her rights. Rather, she asserts that the

Clerk Defendants were required to send the Release Order promptly to CCDC to effect her release, but failed to do so. The failure to complete such a ministerial task is not protected by judicial immunity. *See id.* at 4. The Court will separately address the other arguments for dismissal of Counts 34 and 35.

### 4. Prosecutor Defendants

The Prosecutor Defendants have immunity from the claims in Counts 31, 32, and 33. Prosecutors have absolute immunity when performing prosecutorial functions. *See Imbler v. Pachtman*, 424 U.S. 409, 422-23 (1976); *Nero v. Mosby*, 890 F.3d 106, 117 (4th Cir. 2018). The inquiry focuses on whether a prosecutor's actions are closely associated with judicial process. *See Burns v. Reed*, 500 U.S. 478, 479 (1991). Prosecutorial immunity applies to functions such as evaluating evidence assembled by the police, deciding to seek an arrest warrant, preparing and filing charging documents, participating in a probable cause hearing, and presenting evidence at trial. *Nero*, 890 F.3d at 118.

In the Amended Complaint, Doe alleges that ASA Wells, in conjunction with certain COs, participated in maliciously prosecuting her before the District Court by filing the July 9, 2015 motion to compel Doe to submit to CCDC's intake requirements and by opposing defense counsel's motion for a revision to Judge Ellinghaus-Jones's July 20, 2015 order granting the motion to compel. Although Doe claims that ASA Wells's actions were investigatory rather than prosecutorial, the motion to compel was litigated after charges had been initiated and was necessarily aimed at advancing the prosecution in the District Court. Doe's allegations against State's Attorney DeLeonardo are primarily based upon his alleged failure to supervise ASA Wells so as to prevent the actions he took and his alleged decision to punish Doe by delaying the dismissal of the charges until just prior to the trial date. The decision whether and when to seek dismissal

of criminal charges is inherently prosecutorial. Where the claims against the Prosecutor Defendants relate to their prosecution of Doe in the District Court and to decisions made as part of their prosecutorial functions, they must be dismissed based on prosecutorial immunity. *See Imbler*, 424 U.S. at 431; *Nero*, 890 F.3d at 118.

      **D.**    ***Monell* Claims**

The Amended Complaint asserts official capacity claims against local government personnel, specifically CCDC Warden Hardinger and the CO Defendants, who are employed by the Board of County Commissioners of Carroll County ("Carroll County"). Defendants argue that such claims should be dismissed because Doe has failed to state a plausible claim of a custom or policy of violating constitutional rights, as required by *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

Section 1983 provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983 (2018). A suit against a government employee in that employee's official capacity is the equivalent of a suit against the government entity. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citations omitted). Thus, the official capacity claims are claims against Carroll County.

In *Monell*, the United States Supreme Court concluded that local government entities are considered "persons" for the purposes of § 1983, but they may not be held liable solely because they employ an individual who committed an unlawful act. 436 U.S. at 690-91. Rather, local governments may be sued only if the alleged constitutional violation results from a custom or policy of the local government. *Id.* Even to the extent that the Amended Complaint could be

construed to allege a custom and policy of constitutional violations at CCDC, Doe has offered no facts demonstrating that the treatment she allegedly received was part of a governmental custom or policy. Rather, all of the allegations focused on the specific treatment of Doe under the highly unique circumstance of an arrestee who refused to identify herself in any way. Accordingly, Doe's claims against Warden Hardinger and the CO Defendants in their official capacities will be dismissed.

Likewise, an entity such as CONMED may be held liable under § 1983 only to the extent that it has a custom or policy that causes a violation of the Constitution or laws of the United States, such as a policy of deliberate indifference to serious medical needs. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727–28 (4th Cir. 1999); *Monell*, 436 U.S. at 690-91. Here, where the allegations against CONMED personnel relate to the unique situation in which Doe refused to identify herself at all, the Amended Complaint does not provide sufficient facts to support that CONMED had, or was exercising, any particular custom or policy. Accordingly, the Motion will be granted as to the claim against CONMED in Count 17.

### E. Statute of Limitations

Defendants argue that certain counts must be dismissed as barred by the statute of limitations, specifically, the claims in Counts 1-8 that Defendants violated the Fourth, Fifth, and Fourteenth Amendments and Article 24 and Article 26 of the Maryland Declaration of Rights based on the arrest, detention, and charging of Doe on June 27, 2015. Although the individual counts contain redundancies, they are fairly construed as alleging: (1) in Count 1, that on June 27, 2015, the Deputy Sheriff Defendants unlawfully arrested Doe without probable cause, and had her held in pretrial detention for 67 days without probable cause; (2) in Count 2, that on June 27, 2015, the Deputy Sheriff Defendants unlawfully searched her car without probable cause; (3) in Count

3, that on June 27, 2015, Deputy Sheriff Craft used excessive force against Doe in arresting her without probable cause, including by restraining her in a police car; (4) in Count 4, that on June 27, 2015, Deputy Sheriff Kriete used excessive force against Doe in arresting her without probable cause, including by restraining her in a police car; (5) in Count 5, that on June 27, 2015, Deputy Sheriff Metzler used excessive force against Doe in arresting her without probable cause, including by restraining her in a police car; (6) in Count Six, that on June 27, 2015, Deputy Sheriff Craft violated Doe's due process rights by advancing a malicious prosecution without probable cause through the inclusion of knowingly false statements in charging documents; (7) in Count 7, that on June 27, 2015, CO McCrea violated Doe's due process rights by advancing a malicious prosecution without probable cause by facilitating the inclusion of knowingly false statements in charging documents; and (8) in Count 8, that from June 27, 2015 to September 1, 2015, COs McCrea, Boyd, and Bolner unlawfully searched Doe's flash drives, including by improperly drafting an application for a search warrant after they had already searched the flash drives without a warrant.

Doe asserts that these claims are timely because her original Complaint was effectively filed on June 30, 2018, and because her constitutional claims reflect ongoing violations of her Fourth Amendment rights, such that the limitations period did not begin to run until her pretrial detention concluded on September 1, 2015. As a threshold issue, the Court rejects Doe's claim that the original Complaint, which was actually filed on Monday, July 2, 2018, should be deemed filed on Saturday, June 30, 2018. To the extent that June 30, 2018 was the last day of the limitations period for certain counts, Federal Rule of Civil Procedure 6 would arguably have extended the deadline to the following Monday, but it would not have changed the date of filing. Fed. R. Civ. P. 6(a)(1)(C).

Furthermore, § 1983 does not contain its own statute of limitations, so courts must apply the statute of limitations from the most analogous state law cause of action. *Owens v. Balt. City State's Atty's Office*, 767 F.3d 379, 388 (4th Cir. 2014). Where all of the events in this case occurred in Maryland, the Court applies Maryland's three-year statute of limitations for civil actions to § 1983 claims. *See* Md. Code Ann., Cts. & Jud. Proc. § 5–101 (2013); *Owens*, 767 F.3d at 388. Although state law provides the limitations period for Doe's claims, federal law controls when those claims accrue. *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995). Under federal law, "a cause of action accrues when the plaintiff possesses sufficient facts about the harm done . . . that reasonable inquiry will reveal his cause of action." *Id.* Under this standard, the cause of action accrues when the plaintiff has actual knowledge of the claim or when the plaintiff is put on notice, such as by the knowledge of the fact of injury and who caused it, such that the plaintiff could "make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." *Id.*

Ordinarily, "a defense based on the statute of limitations must be raised by the defendant through an affirmative defense, *see* Fed. R. Civ. P. 8(c), and the burden of establishing the affirmative defense rests on the defendant." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). Thus, a motion to dismissed filed pursuant to Federal Rule of Civil Procedure 12(b)(6) may challenge a claim as time-barred only in the "relatively rare circumstances" where "all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint*.'" *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)).

### 1.      Counts 1-5

Counts 1-5 assert Fourth Amendment and analogous state constitutional claims for an unlawful arrest without probable cause (Count 1), unlawful pretrial detention without probable

cause (Count 1), an unlawful search of Doe's car (Count 2), and excessive force during the arrest (Counts 3-5). The claims in Counts 2-5 all relate to events that began and ended on June 27, 2015. As of that date, Doe was on notice and had knowledge of the unlawful search and the use of force against her when she was restrained and bound, and that the Deputy Sheriffs were responsible for these actions. *See Childers Oil Co., Inc. v. Exxon Corp.*, 960 F.2d 1265, 1271 (4th Cir. 1992) (stating that the statute of limitations begins to run when "the plaintiff has, or ought to have, answers to two questions: Am I injured? Who injured me?"). Because the limitations period ended on June 27, 2018, and the Complaint was not filed until July 2, 2018, these claims are time-barred.

As for Doe's claim in Count 1 of an unlawful arrest, the Supreme Court has held that the "statute of limitations upon a § 1983 claim seeking damages for false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." *Wallace v. Kato*, 549 US. 384, 397 (2007). The Court reasoned that for a claim of false arrest, "damages . . . cover the time of detention up until issuance of process or arraignment, but not more. From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself." *Id.* at 390. Accordingly, the limitations period on the unlawful arrest claim began to run on June 27, 2015, when Doe appeared before Commissioner Miner and was ordered detained on the pending charges without bail because she refused to identify herself.

Doe asserts that she was not detained pursuant to legal process at that first hearing before Commissioner Miner on June 27, 2015 because Miner refused to set bail that day. However, she offers no authority for the proposition that a false arrest continues until a bail amount is set, in this

case, on June 30, 2015 before Judge Reese. Doe's unlawful arrest claim against the Deputy Sheriff

Defendants therefore accrued on June 27, 2015 and must have been asserted by June 27, 2018.

This claim, filed on July 2, 2018, must be dismissed as untimely.

By contrast, Doe's claim in Count 1 that she was subjected to unlawful pretrial detention

without probable cause is not time-barred. In *Wallace*, the Supreme Court stated that, like a claim

of false arrest, "[f]alse imprisonment consists of detention without legal process," such that "a

false imprisonment ends once the victim becomes held pursuant to such process—when, for

example, [one] is bound over by a magistrate or arraigned on charges." *Id.* at 389-90 (citations

omitted). The Court further stated that "unlawful detention forms part of the damages for the

entirely distinct tort of malicious prosecution." *Id.* at 390. Although *Wallace* suggests that a claim

of unlawful pretrial detention should be treated the same way as a claim of unlawful arrest, the

Supreme Court has more recently clarified that "the Fourth Amendment governs a claim for

unlawful pretrial detention even beyond the start of legal process." *Manuel v. City of Joliet*, 137

S. Ct. 911, 920 (2017). In *Manuel,* the Court stated that:

> The Fourth Amendment prohibits government officials from detaining a person in
> the absence of probable cause . . . That can happen when the police hold someone
> without any reason before the formal onset of a criminal proceeding or when legal
> process itself goes wrong—when, for example, a judge's probable-cause
> determination is predicated solely on a police officer's false statements. Then, too,
> a person is confined without constitutionally adequate justification.

*Id.* at 918. Because the initiation of legal process "cannot extinguish the detainee's Fourth

Amendment claim" or convert it into a due process claim only, a complaint "that a form of legal

process resulted in pretrial detention unsupported by probable cause" implicates the Fourth

Amendment. *Id.* at 919. Thus, where "the wrong of detention without probable cause continues

for the duration of the detention," the part of Count 1 in which Doe asserts that her pretrial

detention lacked probable cause did not accrue until she was released from such detention on

September 1, 2015. *Manuel v City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018) (on remand from the Supreme Court, holding that the limitations period on an unlawful pretrial detention claim begins upon release from detention). This claim is therefore timely.

### 2. Counts 6-7

The claims in Counts 6 and 7, in which Doe asserts that Deputy Sheriff Craft and CO McCrea deliberately included false information in charging documents to support unjustified charges against her, are most fairly construed as due process claims under the Fifth and Fourteenth Amendments, akin to a malicious prosecution claim. In *McDonough v. Smith*, 139 S. Ct. 2149 (2019), the Supreme Court held that a plaintiff asserting a due process claim based on the alleged fabrication of evidence in a criminal prosecution, comparable to a malicious prosecution claim, had "a complete and present cause of action," such that the statute of limitations began to run, "only once the criminal proceedings against him terminated in his favor." *Id.* at 2154-55, 2158-59. The United States Court of Appeals for the Fourth Circuit has further clarified that a claim of malicious prosecution and related due process claims becomes ripe, not when the conviction is vacated, but when the criminal proceeding at issue is favorably terminated "in such a manner that [it] could not be revived," which can occur when a *nolle prosequi* is entered. *Owens*, 767 F.3d at 390. Under *McDonough* and *Owens*, Counts 6 and 7 accrued on August 28, 2015, when the *nolle prosse* was entered. Doe's Amended Complaint was therefore timely as to these claims. The Motion will be denied as to the statute of limitations argument relating to Counts 6 and 7.

### 3. Count 8

Finally, Defendants argue that the statute of limitations bars Count 8, in which Doe claims that on June 27, 2015, COs McCrea, Boyd, and Bolner conducted unlawful searches of her flash drives and drafted an affidavit containing false information for purposes of securing a search

warrant for the flash drives. These events occurred more than three years before the filing of the original Complaint. However, the Amended Complaint is not clear on the timeline for the submission of the search warrant application, and Doe alleges that Defendants continued to search the flash drives between June 27, 2015 and September 1, 2015. Doe also contends that from June 27, 2015 through July 5, 2015, Doe overheard COs discussing information she believes could only have been learned from searching the flash drives. Where this claim is not facially barred by the allegations in the Amended Complaint, the Court will deny the Motion as to Count 8. *See Goodman*, 494 F.3d at 464.

### F.    Photographing and Fingerprinting

In Counts 25 and 26, Doe asserts that COs Highsmith, Mays, Koerner, Warner, Davis, and Morell and at least two other unidentified COs forcibly took her mugshot without a warrant, pursuant to Judge Ellinghaus-Jones's July 20, 2015 order (Count 25), and that after correctional staff unsuccessfully sought to take her fingerprints against her will, CO Harmon and other COs and Sheriff's Office personnel arranged to take property from her cell without a warrant to obtain her latent fingerprints (Count 26), in violation of the Fourth, Fifth, and Fourteenth Amendments and Articles 22 and 26 of the Maryland Constitution. According to Doe, when she refused to comply with the court's order, on July 23, 2015, she was forced into a wheelchair and brought to Central Booking, where Davis forced her head up "with his hand on her forehead holding up her head" so her mugshot could be taken. Am. Compl. at 126. When the COs attempted to take her fingerprints, Doe "fisted her hands in her lap" so that they could not do so. *Id.* at 127. During the course of these events, Doe received a bruised arm and had an elevated pulse and blood pressure.

Although Doe claims that the court order was unlawful because she has a Fifth Amendment right to refuse to identify herself, the Supreme Court has held that the Fifth Amendment right

against self-incrimination does not permit an individual to refuse to provide her name. *Hiibel v. Sixth Judicial Dist. Ct. of Nevada*, 542 U.S. 177, 191 (2004) (upholding an arrest and conviction of a defendant for refusing to provide his name to law enforcement, in violation of a state law requiring a suspect to disclose his identity). Likewise, under the Fourth Amendment, law enforcement may require an individual to disclose his name during the course of an investigatory stop. *Id.* at 187. Rather, the Supreme Court has held that "[i]n every criminal case, it is known and must be known who has been arrested and who is being tried." *Maryland v. King*, 569 U.S. 435, 450 (2013). Such identifying information is secured in furtherance of legitimate government interests, including ensuring the identity and criminal history of the suspect detained so "that the custody of an arrestee does not create inordinate risks for facility staff, for the existing detainee population, and for a new detainee"; that the individual accused of crimes will be available for trial; and to make assessments of the danger posed to the public if the arrestee is released on bail. *Id.* at 449-53. Therefore, the Fourth Amendment "allows police to take certain routine "administrative steps incident to arrest," including "book[ing], photograph[ing], and fingerprint[ing]." *Id.* at 458.

Here, Doe admits that she repeatedly declined to provide her name or any identifying information to Defendants or the state court and was ultimately ordered by the court to submit to routine booking procedures to determine her identity. It is undisputed that the relevant CO Defendants acted pursuant to a court order in overcoming her verbal and physical resistance to having her photograph and fingerprints taken, and when it appeared that more force would be necessary to take her fingerprints, they stopped their attempts. Even liberally construed, Doe has failed to allege sufficient facts demonstrating that the CO Defendants' conduct reflects an "expressed intent to punish" or the absence of a "legitimate nonpunitive governmental objective,"

as required to deem the conduct unconstitutional punishment.  *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992).  To the extent that Doe may be arguing that excessive force was used, she has alleged only that that she was seized and forced into a wheelchair and that CO Davis forced her head up and held it in place while the photograph was taken.  Where she has not asserted that any correctional officer punched or otherwise struck her, or used any force other than what was necessary to overcome her resistance, the claims relating to this incident will be dismissed.  *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (stating that a pretrial detainee must show that "the force purposely or knowingly used . . . was objectively unreasonable.").

Likewise, when Doe defied the court order and refused to submit to fingerprinting, the CO Defendants could take items from her cell in order to obtain latent fingerprints.  It is firmly established that no search warrant was required for this action.  *See Bell v. Wolfish*, 441 U.S. 520, 555, 557 (1979) (holding that no warrant was required to search a detainee's drawers, bed, and personal items).  Furthermore, as to CO Harmon, whom Doe accuses of causing pain and suffering to her because she holds him responsible for the taking of an empty shampoo bottle that she used to address pain from a cracked tooth, there are no facts alleged that would support the conclusion that CO Harmon had any knowledge of Doe's cracked tooth or how the shampoo bottle was used. Accordingly, Counts 25 and 26 will be dismissed.

G.    **Pretrial Detention Conditions**

Defendants argue that Doe has failed to state claims for relief against the CO Defendants (Counts 12-13) and the CONMED Contractor Defendants (Counts 14-16) for various conditions and alleged deprivations she endured while detained at CCDC that she believes were motivated by her refusal to identify herself.

As a threshold issue, Defendants assert that certain discrete claims, or parts of claims, are time-barred because Doe filed her Complaint more than three years after the date of occurrence. However, with one exception discussed below, in each instance, the allegedly unlawful conduct extended at least until July 1, 2015, such that the claim was timely because the limitations period for such conduct, which ended on Sunday July 1, 2018, extended to Monday, July 2, 2018, the date the original Complaint was filed. *See* Fed. R. Civ. P. 6(a)(1)(C). When a specific form of allegedly unlawful treatment, such as not providing recreation or showers, was ongoing and extended into the limitations period, the Court will not, as Defendants suggest, deem the conduct on specific days outside the limitations period to be time-barred.

The Fourteenth Amendment proscribes incarcerating a pretrial detainee in conditions that "amount to punishment, or otherwise violate the Constitution." *Bell*, 441 U.S. at 536-37. Conditions that "are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Id.* at 540; *see Feeley v. Sampson*, 570 F.2d 364, 369 (1st Cir. 1978) ("[A]s the maintenance of institutional security directly serves the state's interest in ensuring the detainee's presence [at trial], jail order and security has been accepted as a consideration entitled to great weight when balancing the state's interest against the liberty interest of detainees.").

"Not every disability imposed during pretrial detention amounts to punishment in the constitutional sense . . . Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. *Bell*, 441 U.S. at 537. While "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights . . . enjoyed by convicted prisoners," this does not

mean that these rights are not "subject to restrictions and limitations." *Id.* at 545. A condition or restriction of detention would constitute unconstitutional punishment only if there was an "expressed intent to punish" or the absence of a "legitimate nonpunitive governmental objective." *Hill*, 979 F.2d at 991.

Doe's claims relating to pretrial detention conditions include that she was improperly placed on suicide watch; deprived of appropriate nutrition; deprived of adequate sleep, showers, and recreation; deprived of visitors; denied her right to exercise her religion; and deprived of necessary access to legal materials. The Court will analyze each alleged detention condition in turn. In so doing, the Court also considers whether qualified immunity may apply.

Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Henry v. Purnell*, 501 F.3d 374, 376-77 (4th Cir. 2007). When qualified immunity is asserted, a court must consider two questions: (1) whether the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right; and (2) "whether the right was clearly established," that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Henry*, 501 F.3d at 377. In determining whether a right is "clearly established," the court considers whether "the contours of the right are sufficiently clear that a reasonable officer would understand that what he is doing violates that right" and was thus "on notice" that the conduct violated established law. *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018).

### 1. Suicide Watch

In Counts 13-15, Doe alleges that the CONMED Contractor Defendants and COs Blizzard, Medevich, and Cerny violated her First, Fourth, and Fifth Amendment rights by placing her on Full Suicide Watch ("FSW"), stripping her naked, and forcing her to put on a suicide suit without her consent for eight days, from June 29, 2015 to July 6, 2015. Doe alleges that these actions were taken even though CCDC personnel knew that she was not suicidal, in order to force her to disclose her identity. Defendants argue that Doe's allegations fail to state a claim for relief.

The decision to place Doe on suicide watch did not violate due process. Although prisoners are entitled to due process when sanctions are being imposed that could affect the overall duration of detention, a prisoner does not have a right to due process before placement in a more restrictive housing placement unless the conditions "present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Sandin v. Conner*, 515 U.S. 472, 478-79, 486 (1995). Such a liberty interest exists if the conditions impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. Significantly, the Fourth Circuit has observed that the Due Process Clause imposes an affirmative obligation on the state to prevent detainees from committing suicide while held in a pretrial detention. *See Buffington v. Baltimore Cty., Md.*, 913 F.2d 113, 119 (4th Cir. 1990). A short-term placement on suicide watch does not implicate a constitutionally protected liberty interest. *See Earl v. Raine Cty. Jail*, 718 F.3d 689, 691 (7th Cir. 2013) (holding that a detainee's five-day placement on suicide watch, which required wearing a "suicide-proof gown," did not implicate a liberty interest).

Here, Doe's allegations establish that she gave ambiguous answers to Contractor Schaum such as that she believed "suicide is usually demonically influenced," Am. Compl. at 78, would not give a straight answer whether she was suicidal, and refused to answer many questions

including about her identity and prior history of abuse. After she was already on suicide watch, Contractor Herman met with her to assess her status and, after Doe refused to answer most questions, told her that she was "manic" and "unpredictable," and that, "I don't know what you're going to do." *Id.* at 88. Notably, even if Contractor Schaum may have tried to get Doe to provide her name, Doe provides no specific facts showing that Schaum and Herman, who apparently decided on the FSW designation, were part of any effort to punish Doe in order to compel her to reveal her identity. Doe does not allege facts supporting the conclusion that they were in contact with the State's Attorney's Office or the Sheriff's Office about Doe or were given any direction by the prosecution team on whether to give Doe an FSW designation. Under these circumstances, and where Doe has no general right to due process relating to a limited placement on suicide watch, the Court does not find that Doe has alleged sufficient facts to state a due process claim based on the FSW designation.

Likewise, the Court finds no plausible First Amendment claim relating to Doe's right to free exercise of religion based on this episode. The First Amendment forbids Congress from enacting any "law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. To state a claim for a violation of rights under the Free Exercise Clause, Doe must demonstrate that: (1) she holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on her ability to practice his religion. *See Wilcox v. Brown*, 877 F.3d 161, 168 (4th Cir. 2017). A substantial burden is placed upon a prisoner's religious exercise when it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* Prison restrictions that impact the free exercise of religion but are related to legitimate penological objectives do not run afoul of the Constitution. *See Turner v. Safley*, 482 U.S. 78, 89-91 (1987). Although Doe told Contractor Schaum that she is a Christian and believes that suicide

is demonically influenced, there are no allegations supporting a finding that Contractor Schaum or Contractor Herman treated her any differently because of her religion.  Doe has not alleged that she informed Defendants that taking off her clothes or wearing the suicide suit would somehow violate her religion.  Where the use of the suicide suit is plainly related to a legitimate penological objective, there was no First Amendment violation.

To the extent that Doe's allegations about her forcible placement into a suicide suit on June 29, 2015 asserts a claim of excessive force, this particular claim is time-barred as beyond the three-year statute of limitations.  In any event, Doe's allegations, which are limited to the claims that a female correctional officer stripped off her clothes "with force, leaving her naked," and then "forcibly attir[ed]" her in the suicide suit in view of two female medical contractors, are insufficient to state a plausible excessive force claim.  *See Pitts v. Elliott*, No. JKB-11-397, 2011 WL 6028600, at *8-*9 (D. Md. Nov. 30, 2011) (granting summary judgment to corrections officials on an excessive force claim where the defendants briefly applied force to dress a combative inmate in a suicide gown, including applying pepper spray twice).  The Court will dismiss Counts 13-15.

### 2.  Nutrition

In Counts 12 and 16, Doe alleges that for five days, from June 27 to July 1, 2015, most of the food she was served contained gluten even though she informed CCDC personnel that she had a gluten allergy.  As of July 2, 2015, she began to receive gluten-free meals, but on July 17, 2015, CONMED Contractor Boschert informed her that she needed a doctor's note in order to continue to receive the gluten-free meals.  She asserts that from July 17, 2015 to September 1, 2015, her meals included gluten on at least three occasions.

Upon review of the allegations, the Court finds Doe has failed to state a constitutional claim for deprivation of food. Generally, prisoners "must be provided nutritionally adequate food prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it." *Shrader v. White*, 761 F.2d 975, 986 (4th Cir. 1985) (citations omitted). However, absent injury, the "occasional lapse" in a prisoner's diet does not rise to the level of a constitutional violation. *Love v. Walker*, No. 90-7154, 1991 WL 113606, at *1 (4th Cir. July 17, 1991). Where Doe has not claimed that she was unable to eat anything during the first five days, she was provided with gluten-free meals from July 2, 2015 forward with only rare exceptions even though she had not provided her name or any verification that she required such meals, and Contractor Boschert's statement that a doctor's note would be needed to continue gluten-free meals was in no way improper, the Court concludes that the allegations do not state a valid constitutional claim. For similar reasons, particularly the limited duration of the alleged deprivation, the Court finds that Doe's claim that Warden Hardinger failed to direct his subordinates to provide sufficient dietary oils and vitamins to maintain her health fails to state a plausible claim for relief.

### 3. Sleep, Showers, and Recreation

In Count 12, Doe claims that she was deprived of adequate sleep, showers, and recreation. As to sleep, she claims that from June 27, 2015 to July 7, 2015, she was placed in a brightly lit and noisy booking cell with the lights intentionally left on. Where this condition overlapped in part with the FSW designation and was temporary, and where Doe has not alleged that she was unable to sleep at all, but rather that she did not get "continuous sleep," Am. Compl. at 57, the allegations do not rise to the level of a constitutional violation. *See Martin v. Gentile*, 849 F.2d 863, 870 (4th

Cir. 1988) (observing that "[n]ot every inconvenience encountered during pretrial detention amounts to punishment in the constitutional sense").

As to showers, Doe alleges that she received only one shower from June 27, 2015 to July 7, 2015, specifically on July 2, 2015; she was given a tiny comb and hotel-sized bar of soap; and she was deprived of towels to cover herself while undressed until she was moved to another cell on July 7, 2015. Doe believes that male and female COs were able to view her naked through a video surveillance system. She also asserts that she had to attend court in a dirty and disheveled state.

Particularly where the relevant time period overlapped with the period of suicide watch, the fact that Doe received only one shower between June 27, 2015 and July 7, 2015, though not ideal, does not rise to the level of a constitutional injury. *See Shakka v. Smith*, 71 F.3d 162, 168 (4th Cir. 1995) (holding that denying a prisoner a shower for three days after the prisoner had human feces thrown on him did not violate the Eighth Amendment). Likewise, the fact that Doe was not clean and was unkempt for her court appearances does not state a claim as there are no facts supporting a conclusion that Doe's appearance affected the outcome of her court proceedings.

As for privacy, to the extent that Doe's naked body was exposed to female COs and detainees, she would have no claim. *Cf. Timm v. Gunter*, 917 F. 2d 1093, 1102 (8th Cir.1990) (stating that "minimal intrusions on an inmate's privacy," including opposite-sex surveillance of male inmates when a prisoner uses the bathroom, showers, or sleeps nude are "outweighed by institutional concerns for safety and equal employment opportunities"). However, pretrial detainees have a general right not to be exposed in a state of nakedness to members of the opposite sex, "unless that exposure was reasonably necessary in maintaining . . . otherwise legal detention." *Fisher v. Washington Metro. Area Transit Auth.*, 690 F.2d 1133, 1142 (4th Cir. 1982), *abrogated*

*on other grounds by Cty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991). Where Defendants have not explained why exposure to male COs was necessary, the Court will not dismiss the claim that Doe's rights were violated when she was exposed on surveillance cameras to male correctional officers.

As for recreation, Doe alleges that for six days the CO Defendants failed to inform her that there were opportunities for exercise outside of her cell and did not allow her recreation or fresh air from June 27, 2015 until July 3, 2015, which made her depressed and anxious. Again, this period overlapped with the FSW period. In order to establish a constitutional violation based on conditions of confinement, a prisoner must demonstrate "a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka*, 71 F.3d at 166 (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)). In the related context of convicted prisoners, complete denial of out-of-cell exercise for an "extended period of time" may establish a constitutional violation, based on the totality of the circumstances, and deprivation of "all meaningful opportunities" for exercise would be unconstitutional. *Mitchell v. Rice*, 954 F.2d 187, 191, 193 (4th Cir.1992). Although Doe is a pretrial detainee, the Court notes that she has not alleged a prolonged period without recreational opportunities or significant injury due to the lack of exercise. The Court will therefore grant the Motion as to this claim.

### 4. Visitation

In Count 12, Doe also asserts claims based on the denial of general visitation with family and friends. Although Doe claims that she was not always notified of visitors coming to CCDC, she acknowledges that she received visits from her pastor "once or twice weekly" through July 22, 2015, from certain friends on June 29, 2015 or June 30, 2015, and from Commissioner Richard

Rothschild on July 2, 2015 and July 27, 2015. Am. Compl. at 64, 141. Although CCDC had a policy requiring detainees to list up to eight individuals on an "Approved Visitation List" and provide each person's name, address, sex, and date of birth, *id.* at 64, Doe asserts that she was not given the opportunity to complete a Visitation List, and as a result, certain visitors were turned away because they were not on such a list.

The Fourth Circuit, however, has adopted the view that "there is no constitutional right to prison visitation, either for prisoners or visitors" under the First, Eighth, or Fourteenth Amendments. *Williams v. Ozmint*, 716 F.3d 801, 806 (4th Cir. 2013) (quoting *White v. Keller*, 438 F. Supp. 110, 115 (D. Md. 1977), *aff'd*, 588 F.2d 913, 914 (4th Cir. 1978)). Although the Supreme Court has analyzed the question whether the First Amendment right of association was violated by certain visitation restrictions, it did not hold that it specifically applies to visitation and has not found that right to be implicated under circumstances comparable to the limited failures to admit visitors described by Doe. *See Overton v. Bazzetta*, 539 U.S. 126, 131-32 (2003); *see also Block v. Rutherford*, 468 U.S. 576, 589 (1984) (holding that the Constitution does not require detainees to be allowed contact visits when such visits jeopardize the security of the facility). Where Doe was permitted certain visitors and the alleged restrictions were of limited duration, the Court finds that, at a minimum, the denial of access to certain visitors did not violate a clearly established right, such that the relevant Defendants are entitled to qualified immunity. The Motion will be granted as to the general visitation claim.

### 5. Religion

In Count 12, Doe also alleges that the CO Defendants violated her right to free exercise of religion under the First Amendment and Article 36 of the Maryland Constitution by failing to provide her with a Bible between June 27, 2015 and July 4, 2015, even though CCDC had available

copies, and by denying visits from her pastor after July 22, 2015, after he told Warden Hardinger that he had no information he could provide about Doe's identity. Defendants argue that Doe has failed to state a claim of under the Free Exercise Clause of the First Amendment.

Based on the relevant factors, *see supra* part II.G.1, the Court finds no valid Free Exercise Clause claim. Here, Doe has sufficiently alleged that she holds a sincere belief in Christianity and that she considers it a personal duty to read the Bible daily. *See Wilcox*, 877 F.3d at 168. She also asserts that she requested a copy of the Bible but was not provided with one, even though she claims there were available copies at the CCDC. Although detainees have the right to purchase religious materials and keep them while incarcerated, *Cooper v. Pate*, 378 U.S. 546, 546 (1964) (holding that inmates may not be denied permission to purchase certain religious publications because of their religious beliefs); *Brown v. Peyton*, 437 F.2d 1228, 1230 (4th Cir. 1971), Doe has identified no authority requiring a detention facility to affirmatively provide particular religious materials at government expense. Moreover, Doe acknowledges that she was, in fact, given a Bible free of charge on July 5, 2015 and therefore objects only to not having one for approximately one week. Significantly, this time period overlapped with the days when she was on suicide watch, and Doe has asserted that it was Contractor Schaum who decided to place her on suicide watch and who decided she could not have a Bible. Finally, during the same timeframe, Doe had other resources by which to practice her religion, including access to a CCDC chaplain who visited her in her cell and access to visits from her own pastor. Under these facts, the Court finds no substantial burden on Doe's free exercise rights from CCDC's failure to give her a Bible for a limited period of time. *See Wilcox*, 877 F.3d at 168. At a minimum, the relevant Defendants have qualified immunity because a reasonable officer would not understand that this limited deprivation,

in the context of the suicide watch and the access to a chaplain, violated any clearly established right.

The Court also finds that Doe has failed to state a constitutional claim against the CO Defendants with respect to denial of pastoral visits. Doe has not alleged that visitation with a pastor on any particular schedule is a required part of exercising her faith. Even if she had, Doe has identified no authority stating that there is an affirmative constitutional right to visitation with the pastor of one's choice, and the Court has found none. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 352 (1987) (observing that prison inmates were not "deprived of all forms of religious exercise" of Islam, in part because a state-provided imam had free access to the prison).

Notably, there is no allegation that the pastor was denied visitation rights because of his religious role; rather, Doe claims, without specific factual support, that after the pastor had visited her one to two times a week up to July 22, 2015, the visits were stopped when it became clear that the pastor would not provide CCDC with information about her identity. Furthermore, there are no allegations that Doe was prohibited from speaking to her pastor by telephone or through written correspondence. Doe has also acknowledged that there was a chaplain at CCDC, and there are no allegations that visitation with this individual was prohibited. The Motion will therefore be granted as to the Free Exercise Clause claims relating to pastoral visitation.

Doe asserts comparable claims under Article 36 of the Maryland Declaration of Rights, which provides in relevant part that "all persons are equally entitled to their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice." Md. Dec. of Rights, art. 36. Although Maryland courts have not yet resolved whether and to what extent the First Amendment may be construed *in pari materia* with Article 36, the Court reaches the same conclusion as for the

First Amendment claim and will grant the Motion as to these claims. *See, e.g.*, *Supermarkets Gen. Corp. v. State*, 409 A.2d 250, 258 (Md. 1979) (declining to resolve the question of whether Article 36 and the Establishment Clause of the First Amendment are *in pari materia* where the party made no distinction between the constitutional provisions at issue); *see also Miles v. State*, 80 A.3d 242, 252 (Md. 2013).

### 6. Legal Resources

In Count 12, Doe also alleges that her First Amendment and Sixth Amendment rights were violated where she was provided only one 30-minute opportunity to review her charging papers between June 29, 2015 and July 3, 2015; she was allowed only six one-hour visits, once per week, to the small law library at CCDC between June 27, 2015 and September 1, 2015; she did not have access to a typewriter or computer; on July 24, 2015, her attorney waited two hours before being allowed to see her at CCDC; and on two occasions, a CO could overhear her telephone conversations with her attorney. Doe asserts that, as a result, she was unable to research or prepare a petition for a writ of *habeas corpus*, motions for discovery, or a motion for reconsideration of Judge Ellinghaus-Jones's order compelling her fingerprints.

Claims of inadequate access to legal resources are construed as claims of a denial of the First Amendment right of access to the courts, for which a plaintiff must allege facts showing actual injury or specific harm resulting from the denial of access, such as a meaningful impediment to participation in the legal process or hindrance of a legal claim. *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (en banc) (requiring a prisoner claiming a denial of the right of access to the courts to make specific allegations and identify actual injury resulting from prison officials' conduct); *Strickler v. Waters*, 989 F.2d 1375, 1383 n.10, 1384-85 (4th Cir. 1993). There must be "actual injury" to "the capability of bringing contemplated challenges to sentences or conditions

of confinement before the courts." *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis v. Casey*, 518 U.S. 343, 355 (1996)). Actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was frustrated or impeded because of the denial of access to the courts. *Lewis v. Casey*, 518 U.S. 343, 352-53 & n.3 (1996). The complaint must contain a sufficient description of the predicate claim to permit an assessment of whether it is "nonfrivolous" or "arguable." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Here, Doe has not alleged sufficient facts stating that her access to the law library or its contents were constitutionally inadequate or that she was deprived of access to the courts. Particularly where Doe was represented by an attorney for most proceedings, her attorney filed a motion challenging Judge Ellinghaus-Jones's order, and she was able to visit a law library for six of the approximately nine weeks of her detention, her limited access to the law library did not violate her right to access to the courts. *See Strickler*, 989 F.2d at 1387 (observing that restricting library access to "once a week for at best an hour and at times once in five weeks for an hour . . . satisfied constitutional requirements"). The fact that the library was small in Doe's estimation does not alter that conclusion. *See id.* at 1386 & n.17 (stating that as to a law library, a "local facility need not provide the same resources, much less the same quality or extent of resources, as must a state facility, because the expectation is that its occupants will be confined there only briefly"). Likewise, the fact that Doe did not have access to a typewriter or computer, where she does not allege that CCDC personnel denied her pen and paper, does not state a valid claim for relief.

Furthermore, there are no plausible allegations that that the limited and delayed access to her charging papers caused any specific, actual harm to Doe's legal arguments. Nor does Doe claim that she was prevented from speaking to or engaging with her counsel in person or in writing,

or that her attorney's two-hour wait before visiting her on July 15, 2015 hindered her attorney from providing effective representation. Although Doe alleges that CO Highsmith stood close enough to hear her converse by telephone with her attorney on two occasions, there is no allegation that the conversation was so hindered as to impact a particular legal argument or proceeding. More generally, Doe has provided no allegations showing that these alleged obstacles specifically frustrated or impeded a nonfrivolous legal claim. *See Lewis*, 518 U.S. at 352-53. As noted above, Doe had no Fifth Amendment right to refuse to give her name to law enforcement or the courts. *See Hiibel*, 542 U.S. at 191. Accordingly, the Court will grant the Motion as to Doe's First and Sixth Amendment claims relating to access to legal resources.

### 7. Cumulative Allegations

Where the Court has dismissed the vast majority of Doe's claims as to the conditions of confinement, the Court does not find that Doe has stated a plausible claim for relief on the basis of the cumulative effects of these alleged violations. Accordingly the Court will grant the Motion as to Counts 12-16, with the exception of the part of Count 12 relating to Doe's exposure to male COs.

### H. Health Hazard

In Count 30, Doe alleges that between August 6, 2015 and August 28, 2015, Warden Hardinger became aware of, but intentionally failed to inform inmates about, a scabies outbreak at CCDC. According to Doe, the outbreak was sufficiently serious that Warden Hardinger ordered inmate clothing to be washed and floors, toilets, and mattresses to be cleaned, but he deliberately withheld information from inmates about the risk of infection and how they could avoid it. He also did not order detainees confined together to be medically treated. Doe states that as a result

of these failings, she contracted scabies and a staph infection, and that these conditions could have been avoided if she had received sufficient information to protect herself.

In the related context of convicted prisoners, the Eighth Amendment requires that prison officials maintain "humane conditions of confinement," including taking "reasonable measures to guarantee the safety of the inmates." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016). Doe's claim relating to the handling of, and withholding of information about, the scabies outbreak at CCDC is most fairly construed as a claim that Warden Hardinger unconstitutionally failed to protect detainees from a known safety risk, specifically contracting scabies and related infections. To establish a constitutional claim based on a failure to protect, a plaintiff must satisfy a two-part inquiry that includes both an objective and a subjective component. *See id.* Doe must show objectively "a serious deprivation" of rights "in the form of a serious or significant physical or emotional injury." *Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014). The objective prong requires the prisoner either to produce evidence of such an injury resulting from the challenged conditions or to "demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka*, 71 F.3d at 166 (quoting *Strickler*, 989 F.2d at 1381). Thus, "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" may violate the Constitution, even if "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993); *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011). To establish a sufficiently culpable state of mind, there must be evidence of deliberate indifference, in that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991) (applying the deliberate indifference standard to conditions of confinement claims). "[T]he test is whether the guards know the plaintiff inmate faces a serious

danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

Pretrial detainees "retain at least those constitutional rights [held] by convicted prisoners." *Bell*, 441 U.S. at 545; *see Patten v. Nichols*, 274 F.3d 829, 834 (4th Cir. 2001). Thus, Doe had, at a minimum, a constitutional right to be free from deliberate indifference to her health and safety. *See Hill*, 979 F.2d at 991-92 (holding that although a pretrial detainees rights may be "greater" than those afforded to convicted inmates, "prison officials violate detainee's rights to due process when they are deliberately indifferent to serious medical needs"); *cf. Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-73 (2015) holding that unlike the standard applied to post-conviction detainees' excessive force claims under the Eighth Amendment, the standard for pretrial detainees' excessive force claims under the Fourteenth Amendment includes no subjective component).

At this stage, Doe, who has alleged that she contracted scabies and a staph infection shortly after her release, has stated sufficient facts to support a Fourteenth Amendment claim that Warden Hardinger, by intentionally withholding information from detainees about the scabies outbreak, failed to protect her and other detainees from an unreasonable risk to their health and safety. The Motion will be denied as to Count 30.

## I.    Release

As to the claims in Counts 34 and 35 that the Clerk Defendants failed to transmit the Release Order in a timely fashion, the Court finds that the Amended Complaint contains sufficient facts to state a plausible claim against the specific Clerk Defendant who failed to do so. Doe has asserted that on Friday, August 28, 2015, Clerk Storey mailed the notices of *nolle prosequi* and of

the cancellation of the trial to Doe's address, and that she entered the trial cancellation notice and a Release Order in the computer system. However, Clerk Storey did not sign or fax the Release Order to CCDC that day, and the Release Order was not sent to CCDC until the following Tuesday, September 1, 2015, after Doe's pastor and friends alerted the District Court that it had not been sent. Although there are no facts directly establishing that Clerk Storey was part of any conspiratorial plan to extend Doe's detention, Doe has provided some facts suggesting that there was an interest in keeping Doe detained for a defined period of time. Specifically, Sheriff DeWees was quoted as stating that Doe was released in part because "we . . . felt fairly comfortable she served the appropriate amount of time." Am. Compl. at 149. Where Doe's detention was improperly extended by four days, and there is no clear explanation for Clerk Storey's failure to send the Release Order on Friday, August 28, 2015 or even on Monday August 31, 2015, the Court will deny the Motion as to Clerk Storey. However, where there are no allegations showing that any other Clerk Defendant was aware on August 28, 2015 that Doe was supposed to be released that day, the Motion will be granted as to all other Clerk Defendants named in Counts 34 and 35.

As for the related claim in Count 27 that the CO Defendants deliberately failed to release Doe after the *nolle prosequi* was entered on August 28, 2015, the Court finds that Doe has failed to state a plausible claim for relief. Although Doe asserts, without factual support, that as of August 28, 2015, each CO Defendant was in receipt of or knew about the notice of cancellation of her trial date and the Release Order, she asserts in the same section of the Amended Complaint that Clerk Storey failed to send the Release Order to CCDC that day, and that when asked on the morning of September 1, 2015 why she was not called out for trial that morning, CO Mummert left the housing unit briefly, then returned to report that CCDC had received a fax stating that she was not needed in court that day. She also alleges that when Doe's pastor went to the CCDC lobby

after 9:00 a.m. on September 1, 2015 and asked why Doe had not yet been released, unidentified CO Defendants told him that they had not received any release papers. Then, as a result of an inquiry by Doe's pastor and friends, the District Court faxed the signed Release Order to CCDC on September 1, 2015 at 9:59 a.m., and Doe was promptly released. Where these facts are inconsistent with a conclusion that the CO Defendants actually received the Release Order on Friday, August 28, 2015 and deliberately refrained from releasing Doe, and in any event they do not provide sufficient facts to support a claim against any specific individual CO, the Court finds that Doe has not stated a plausible claim for relief in Count 27. Should discovery relating to Count 34 uncover information supporting liability by specific CO Defendants, Doe would be permitted to amend the complaint to reinstate this claim.

###### J.      Supervisory Liability

Defendants argue that as to Sheriff DeWees (Count 9 and Count 29) and Warden Hardinger (Count 28), Doe's claims fail because the allegations do not support claims that these officials either personally violated Doe's rights or are subject to supervisory liability. Under § 1983, a state official may not be held liable under unless it is "affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Vinnedge v. Gibbs*, 550 F.2d at 928; *see also Monell*, 436 U.S. at 690-92. There is no vicarious liability pursuant to the doctrine of *respondeat superior* in § 1983 cases against government officials for the acts of their subordinates. *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985); *Vinnedge*, 550 F.2d at 928. In order for a supervising official to be held liable under § 1983, a plaintiff must establish that: (1) the supervisor knew that a subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury"; (2) the supervisor's "response showed deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) there was "an affirmative causal link"

45

between the supervisor's "inaction and the constitutional injury." *King v. Rubenstein*, 825 F.3d 206, 224 (4th Cir. 2016) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)). "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions, and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (quoting *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984)).

Doe generally asserts that Sheriff DeWees failed to train, supervise, or discipline the Deputy Sheriff Defendants and the CO Defendants, and that he knew or should have known about the alleged misconduct by the Deputy Sheriffs but nevertheless permitted it. Based on the Court's analysis above, the remaining claims involving the conduct of Sheriff DeWees's subordinates include constitutional claims of unlawful pretrial detention and malicious prosecution without probable cause, and a due process violation relating to personal privacy. Although there are no allegations of any interactions between Sheriff DeWees and the Defendants responsible for these actions in advance of the alleged misconduct, the Amended Complaint alleges that Sheriff DeWees was aware of and actively involved in the matter relating to Doe, including that he acknowledged some role in the decisions relating to her detention and prosecution through his statements when Doe was released in September 2015 that she would have received a traffic citation had she cooperated and displayed a driver's license during the June 27, 2015 traffic stop, and that she was released after "we . . . felt fairly comfortable she served the appropriate amount of time." Am. Compl. at 149. Viewed in the light most favorable to Doe, there are allegations that support the conclusion that Sheriff DeWees had a role in the decisions relating to the prosecution of Doe. Accordingly, the Court will not dismiss the claim in against Sheriff DeWees in Counts 9 and 29 relating to his supervisory role in the remaining claims against his subordinates.

As to Count 28 against Warden Hardinger, on the only remaining condition of confinement claim relating to Doe's privacy, Doe has alleged that it was only after Carroll County Commissioner Richard Rothschild intervened on July 2, 2015 that Warden Hardinger was moved to a cell on July 7 with access to a shower without camera surveillance. Viewed in the light most favorable to Doe, this allegation could support a conclusion that Warden Hardinger, a subordinate to the Commissioner, was aware of the lack of privacy before July 2, 2015 but took no action. Accordingly, the Court will deny the Motion as to Count 28 on this issue.

**K.      Relation Back**

Defendants argue that the claims asserted against new Defendants added to the case in the Amended Complaint are time-barred because they do not relate back to the original Complaint. Where the claims against certain Defendants will be dismissed, the Court will analyze this issue as to COs Bolner, J. Cerny, Morrell, Smith, Parks, and Davis only. An amendment relates back to the date of the original complaint when:

> the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> > (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
> > (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1). When determining whether an amendment relates back due to the plaintiff's mistake in failing to name a party, naming the wrong party, or misnaming the party, courts assess whether "the rights of the new party, grounded in the statute of limitations, will be harmed if that party is brought into the litigation." *Goodman*, 494 F.3d at 471. If a party has been given fair notice of a claim within the limitations period and "will suffer no improper prejudice"

in defending against the claim, "the liberal amendment policies of the Federal Rules favor relation-back." *Id.*

Here, the Court finds that Doe's claims against these new Defendants relate back to the original Complaint where Doe's claims against them arise out of the same transactions or occurrences as the claims in the original Complaint, Fed. R. Civ. P. 15(c)(1)(B), and it is reasonable to conclude that these COs were on notice within the original service period that they were subject to suit based on these incidents but for Doe's inability to identify them. Accordingly, the Court will deny the Motion on this ground.

## L.     State Law Immunity

Defendants argue that on the state law claims, Defendants who are state officials are immune from suit based on statutory immunity for state officials under the Maryland Tort Claims Act ("MTCA"), Md. Code Ann., State Gov't § 12–105 (Supp. 2019), and that Defendants who are county officials are entitled to statutory public official immunity under Md. Code Ann., Cts. & Jud. Proc. § 5–507 and common law public official immunity. As discussed above, where Doe has clarified in her Opposition that she is not asserting state common law tort claims, these arguments relate only to the state constitutional claims arising under the Maryland Declaration of Rights.

As to public official immunity, the Maryland Court of Appeals has held that it is not available to the state constitutional claims. *See Lovelace v. Anderson*, 785 A.2d 726, 734 (Md. 2001) (stating that the defense of public official immunity is not applicable in actions "based on rights protected by the State Constitution"). Although state personnel immunity under the MTCA can apply to state constitutional torts, that immunity is available only for tortious acts performed without malice or gross negligence. *See Lee v. Cline*, 863 A.2d 297, 307, 310 (Md. 2004). As to

the remaining state constitutional claims, the Court finds that Doe has sufficiently alleged that the conduct involved gross negligence or malice such that, at this stage, no immunity is warranted. Accordingly, the Motion will be denied as to the state law immunity arguments.

**M.    Abstention**

Finally, Defendants assert in the alternative that the Court should abstain from exercising federal jurisdiction over this matter pursuant to *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), because this case is essentially identical to the two state court actions on appeal, and where Doe filed the state court actions first, proceeding with the case in federal court will result in piecemeal litigation. Doe argues that abstention is not warranted because the state court actions were filed three days and one day, respectively, before the federal court case, such that the actions were filed nearly simultaneously, and because the state court dismissed the cases solely on the issue of Doe's name, which at this point has been resolved in Doe's favor in this Court.

"The rule is well recognized that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *VonRosenberg v. Lawrence*, 849 F.3d 163, 167 (4th Cir. 2017) (quoting *McClellan v. Carland*, 217 U.S. 268, 262 (1910)). However, under exceptional circumstances, a district court may abstain from the exercise of jurisdiction in favor of parallel state court proceedings based on "considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Colo. River*, 424 U.S. at 817; *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 14-15 (1983); *Kruse v. Snowshoe Co.*, 715 F.2d 120, 122-23 (4th Cir. 1983).

A party seeking abstention pursuant to *Colorado River* must show that two conditions are satisfied. "As a threshold requirement, there must be parallel proceedings in state and federal

court." *Gannett Co. v. Clark Constr. Grp., Inc.*, 286 F.3d 737, 741 (4th Cir. 2002). Then, the moving party must establish that exceptional circumstances warrant abstention based on consideration of six factors: (1) whether the subject matter of the litigation involves property over which one court may exercise *in rem* jurisdiction; (2) whether the federal forum is inconvenient; (3) the desirability of avoiding piecemeal litigation; (4) the relevant order in which the courts obtained jurisdiction and the progress achieved in each action; (5) whether state law or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights. *See id.*; *Vulcan Chem. Techs., Inc. v. Barker*, 297 F.3d 332, 341 (4th Cir. 2002). The decision to stay or dismiss the federal action "does not rest on a mechanical checklist, but on a careful balancing of the important factors . . . as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 16. The Court's task is "not to find some substantial reason for the *exercise* of federal jurisdiction," but rather "to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction." *VonRosenberg*, 849 F.3d at 167 (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 25-26).

Here, the Court does not find that exceptional circumstances warrant abstention at this time. Only the third factor, desirability of avoiding piecemeal litigation, favors abstention. The fourth factor, the timing of filing of the state court actions, does not weigh in favor of abstention where the cases were filed no more than three days before the federal court action. Most significantly, where Doe's claims primarily arise under the United States Constitution, the fifth factor weighs against abstention. Under these circumstances, the Court will not abstain. *See Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457, 465-66 (4th Cir. 2005) ("The threat of piecemeal

litigation in the sense that two cases proceed simultaneously . . . is not sufficient to support a decision to abstain under *Colorado River*.").

The Court is mindful, however, that the issue of Doe's name and identity is grounded in state law and that the appeal of the state court actions may result in further clarification of Maryland law on this issue. Moreover, in the present case, this issue remains subject to further factual development as this case proceeds. The Court will therefore deny the Motion as to abstention without prejudice.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART. The Motion will be GRANTED as to all official capacity claims and as to Counts 2-5, 10-11, 13-27, 31-33, and 35 in their entirety. The Motion will be DENIED as to the following claims asserted within Counts 1, 6-9, 12, 28-30, and 34: (1) the Fourth Amendment claim of pretrial detention without probable cause (Count 1); (2) the Fifth Amendment claims of malicious prosecution (Counts 6-7); (3) the Fourth Amendment claim of an unlawful search of the seized flash drives (Count 8); (4) the Fourteenth Amendment claim against the Correctional Officer Defendants named in Count 12 relating to exposure of Doe to male COs while in the booking cell (Count 12); (5) the Fourteenth Amendment claim against Warden Hardinger relating to the failure to inform Doe of the scabies outbreak (Count 30); (6) the Fifth and Fourteenth Amendment claims against Clerk Storey for failure to transmit Doe's Release Order on August 28, 2015 (Count 34); and (7) the claims against Sheriff DeWees and Warden Hardinger as they relate to the other remaining claims (Counts 9, 28, and 29). The Motion will also be DENIED as to the state constitutional claims analogous to these remaining federal claims. The Motion will be

GRANTED as to all other claims asserted within Counts 1, 6-9, 12, 28-30, and 34. A separate

Order shall issue.


Date:  March 23, 2020                                    _____/s/_____
                                                                    THEODORE D. CHUANG
                                                                    United States District Judge